[L. A. No. 25012. In Bank. June 24, 1959.]

J. KATZEV et al., Appellants, v. COUNTY OF LOS ANGELES et al., Respondents.

Gang, Kopp & Tyre, Martin Gang, Milton A. Rudin and Payson Wolff for Appellants.

A. L. Wirin, Fred Okrand and Richard J. Kamins as Amici Curiae on behalf of Appellants.

Harold W. Kennedy, County Counsel, and David D. Mix, Deputy County Counsel, for Respondents.

McCOMB, J.—Plaintiffs appeal from an adverse judgment in a declaratory relief action attacking as unconstitutional a county ordinance prohibiting the sale or circulation of any "crime comic book" to any child under the age of 18 years and declaring a violation of the ordinance to be a misdemeanor.

Plaintiffs are dealers in magazines, books and other printed material, including crime comic books, and the distribution of the latter would be impaired through enforcement of the ordinance.

The ordinance, Number 6633, reads:

An Ordinance prohibiting the sale and circulation of crime "comic" books to children under the age of eighteen (18) years.

The Board of Supervisors of the County of Los Angeles do ordain as follows:

Section 1. The Board of Supervisors finds that in the unincorporated area of Los Angeles County:

a. There is a great volume in the number and variety of crime "comic" books available to children under the age of eighteen (18) years.

b. These crime "comic" books resemble closely other publications devoted in substance to humor.

c. These crime "comic" books are placed for sale side by side with humorous publications.

d. These crime "comic" books have been sold or circulated to children under eighteen (18) years of age.

e. Many children have been incited to commit crimes as a consequence of looking at crime "comic" books.

f. Many children have been incited to attempt the commitment of a crime as a consequence of looking at crime "comic" books.

g. There is a clear and present danger which the Board of Supervisors finds is great and imminent that the continued sale and circulation in the unincorporated area of Los Angeles County of crime "comic" books to children will incite said children to commit crimes or attempt to commit crimes and inculcate a preference in the minds of many of the children to participate in crime.

h. The Board of Supervisors specifically finds that the prohibition against the sale to or circulation of crime "comic" books to children is a reasonable measure to meet the clear and present danger hereinabove found.

Section 2. Every person is guilty of a misdemeanor who sells or circulates any crime "comic" book to any child under the age of eighteen (18) years.

Section 3. This ordinance shall not apply:

a. To those accounts of crime which are part of the general dissemination of news.

b. To those accounts of crime which appear in a newspaper of general circulation.

c. To those accounts of crime which delineate actual historical events.

d. To those accounts which delineate occurrences actually set forth in the sacred scriptures of any religion.

Section 4. As used in this ordinance, the following terms shall have the meaning given herein. When not inconsistent

with the context, words used in the present tense include the future, words in the plural number include the singular number, and words in the singular number include the plural number.

a. Crime "comic" book: Any book, magazine, or pamphlet in which an account of crime is set forth by means of a series of five (5) or more drawings or photographs, in sequence, which are accompanied by either narrative writing or words represented as being spoken by a pictured character, whether such narrative or words appear in "balloons," captions or on or immediately adjacent to the photograph or drawing.

b. In sequence: In direct order, excluding intervening breaks which continue the account, where such intervening breaks

(1) contain narrative material, or

(2) contain a drawing or photograph without words or narrative material.

c. Crime: The commission or attempted commission of an act of arson, burglary, kidnapping, mayhem, murder, rape, robbery, theft, train-wrecking, or voluntary manslaughter; or the commission of an act of assault with caustic chemicals or assault with a deadly weapon. As the term "crime" is used in paragraph "a." of this section, it includes but is not limited to, acts by human beings, and further includes acts by animals or any non-human, part human, or imaginary beings, which if performed by a human would constitute any of the crimes named.

d. Balloon: The outline enclosing words represented as coming from the mouth of a pictured character.

e. Person: Any person, firm, association, organization, partnership, business trust, corporation, or company.

f. Sells or circulates: To sell, offer for sale, attempt to sell, exhibit, give away, keep in possession with intent to sell or give away, or in any way furnish or attempt to furnish.

g. Sacred scriptures: The Bible, including any version thereof, or any writing of similar stature in any established religion.

Section 5. Every violation of this ordinance shall be punishable by imprisonment in the county jail for not more than six (6) months or by a fine or [sic] not more than $500, or by both such fine and imprisonment.

Section 6. If any provision of this ordinance, or the application thereof to any person or circumstance is held invalid, the remainder of the ordinance, and the application of such provision to other persons or circumstances shall not be affected thereby.

Section 7. Crime "comic" books are now being sold and circulated to children under the age of eighteen (18) years in the unincorporated territory of Los Angeles County, destroying their moral fiber and inciting them to crime and juvenile delinquency. Such damage, once accomplished, is irreparable. By reason of the foregoing, this ordinance is immediately needed for the preservation of the public health, safety, and welfare and shall take effect upon the passage hereof.

Section 8. This ordinance shall be published in Journal of Commerce and Independent Review, a newspaper printed and published in the County of Los Angeles.

 Question: *Is the ordinance unconstitutional under the First Amendment to the United States Constitution (made applicable to the states by the Fourteenth Amendment), which prohibits the enactment of any laws "abridging the freedom of speech, or of the press," and under article I, section 9, of the California Constitution, which forbids the passage of any law "to restrain or abridge the liberty of speech or of the press"?*

*Yes,* for these reasons:

*First.* The ordinance is an unjustifiable abridgment of freedom of the press, because distribution of such crime comic books is protected by the state and federal Constitutions, and no showing has been made of a clear and present danger of a substantive evil justifying suppression of the constitutional guarantee.

These principles are here applicable:

 i. Publications containing criminal news, accounts of criminal deeds, or pictures and stories of bloodshed, lust, or crime are as much entitled to the protection of free speech as other literature (*Winters* v. *New York,* 333 U.S. 507, 510 [68 S.Ct. 665, 92 L.Ed. 840]);

 ii. In reviewing the findings of the trial court as to whether an ordinance infringes the First Amendment to the United States Constitution or article I, section 9, of the California Constitution, the court will make an independent examination of the evidence to ascertain whether there has been a

violation of either of the provisions (*Feiner* v. *New York*, 340 U.S. 315, 316 [71 S.Ct. 303, 328, 95 L.Ed. 267, 295]) ; and

■ iii. However reprehensible a legislative body may regard certain publications, it cannot forbid them if they present no "clear and present danger" that they will bring about a substantive evil that the legislative authority has a right to prevent (*Danskin* v. *San Diego Unified Sch. Dist.*, 28 Cal.2d 536, 542 [1] [171 P.2d 885] ; *Bridges* v. *California*, 314 U.S. 252, 261 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346] ; *People* v. *Garcia*, 37 Cal.App.2d Supp. 753, 761 [7] [98 P.2d 265]).

Applying the foregoing rules to the ordinance in the instant case, we must re-evaluate the evidence to determine whether there is a "clear and present danger" of a substantive evil warranting the suppression of freedom of speech as guaranteed by the constitutional provisions.

This court must then determine whether the gravity of any such "evil," discounted by its improbability, "justifies" invasion of freedom of speech in order to avoid the "danger." (*Dennis* v. *United States*, 341 U.S. 494, 510 [71 S.Ct. 857, 95 L.Ed. 1137].)

In *West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624, 639 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], the court said : "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

Again, in *Thomas* v. *Collins*, 323 U.S. 516, 530 [4-6] [65 S.Ct. 315, 89 L.Ed. 430], the court said: "For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending."

In *In re Lyons*, 27 Cal.App.2d 293, 296 [81 P.2d 190], it was accurately stated: "The courts have always been zealous to protect the rights of persons to acquire, own and enjoy property. They have been more zealous, if possible, to protect the personal right of free speech, and perhaps justly so, for free discussion contains the germ of progress which keeps flowing the blood stream of the Republic."

The record in the present case fails to disclose a close, causal connection between the substantive evil—juvenile delinquency—and the circulation of crime comic books in general.

The board of supervisors found, in passing ordinance 6633, that there are within the county of Los Angeles a great volume and variety of crime comic books available to children under the age of 18 years; that they are sold or circulated to children, many of whom are thereby incited to commit or attempt to commit crimes; and that such books destroy the moral fiber of children and incite them to crime and juvenile delinquency.

The record fails to show that there is a clear and present danger that the circulation of crime comic books in general will injure the character of persons under the age of 18 years and inculcate in them a preference for crime. Accordingly, the ordinance is unconstitutional under the above constitutional provisions.

*Second.* Because it applies to publications that have no relationship to juvenile delinquency, the ordinance is too broad. The ordinance makes it a crime to circulate any comic books which contain fictional, nonreligious accounts of crime. The definition of what constitutes a crime comic book is found in section 4a of the ordinance, which states that a "crime comic book" is "Any book, magazine, or pamphlet in which an

account of crime is set forth by means of a series of five (5) or more drawings or photographs. . . .'' Section 4c defines ''crime'' by listing specific crimes and adds that as this word is used in the ordinance it includes acts by animals or imaginary beings which if performed by humans would constitute one of the crimes named.

The ordinance does not require that the drawings be lewd or depict brutality, sadism, gore or horror; nor does the ordinance limit its application to accounts of crime which glorify the crime or the criminal, make crime attractive or depict in detail the manner in which crimes are committed. The ordinance brings within its scope such publications as New Funnies (town attacked by bandits in Woody Woodpecker story); Bugs Bunny (Bugs steals diamonds); and Classic Comics (Treasure Island). Conversely, it is quite obvious that many crime, horror, or sex comic books containing the features most objectionable may continue unaffected by the ordinance because they are not fictional or do not contain accounts of the enumerated crimes.

The failure of the ordinance to draw any distinction between various accounts of crime makes it unconstitutional. This overbroadness is well illustrated by the following: A parent or a dealer circulates a comic book to a child. It is a Bugs Bunny comic in which buried somewhere deep in the book is an account of Bugs' stealing jewels from humans. The adult circulating the comic is guilty of a crime; intent on the part of the defendant is not a prerequisite. The adult cannot guard himself by merely glancing over the type of comic book he is circulating and relying on a well-founded assumption that the particular comic book is harmless for children.

The distributors of such comic books will be forced either to stop selling all comic books or to read every page of every title they sell. Similarly, the parent, the barber, the dentist, and the doctor who allow children to read comic books will have to check every page to determine whether somewhere hidden innocuously away is the portrayal of a crime. The newsdealer could leaf through a comic book and quickly determine whether it falls under clear standards of the lurid, gruesome, or macabre, based upon the manner of depiction. However, under the present ordinance, his failure to check thoroughly each page might subject him to the chance of criminal liability.

*Third.* The ordinance denies distributors such as

plaintiffs equal protection of the laws, since it establishes arbitrary and unreasonable exemptions.

The ordinance is unconstitutional because it unreasonably exempts certain types of comic books and comic strips and thus denies plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution and article I, section 11, of the California Constitution.

Sections 3c and 3d of the ordinance exempt from the ban many comic books dealing solely with luridly depicted tales of violence and crime, because the stories are true or drawn from religious writings. Section 3b grants exemption to comic strips in newspapers, although these comic strips may not vary one iota from those appearing in the comic book media.

Because these exemptions are unrelated to the purported purpose of the legislation, they impose an unfair burden on plaintiffs, thus denying them equal protection of the laws.

An exemption must be reasonable in order to meet the standard prescribed by *Yick Wo* v. *Hopkins,* 118 U.S. 356, where it is stated at page 369 [6 S.Ct. 1064, 30 L.Ed. 220] that "the equal protection of the laws is a pledge of the protection of equal laws."

Where the legislative classification is unreasonable, the courts will invalidate the law. In *Franchise Motor Freight Assn.* v. *Seavey,* 196 Cal. 77, 81 [2] [235 P. 1000], we said that "a statute makes an improper and unlawful discrimination if it confers particular privileges upon a class arbitrarily selected from a larger number of persons all of whom stand in the same relation to the privileges granted and between whom and the persons not so favored no reasonable distinction or substantial difference can be found justifying the inclusion of the one and the exclusion of the other (5 Cal.Jur. 825, and cases cited)." (*Cf. Barker Bros., Inc.* v. *City of Los Angeles,* 10 Cal. 2d 603, 608 [5] et seq. [76 P.2d 97]; *Smith* v. *Cahoon,* 283 U.S. 553, 556-557 [51 S.Ct. 582, 75 L.Ed. 1264].)

No valid reason has been presented why comic books dealing in a disgustingly detailed way with the exploits of Murder, Incorporated, John Dillinger, or Jesse James will have any less harmful effect on children than Popeye, Tom Mix, or fictionalized accounts of the activities of law enforcement officials like G-Men.

The ordinance is invalid for drawing an irrational line between all true accounts of crime, even though disgustingly portrayed, and all fictional accounts of crime. The

ordinance ignores the important factor which might support some comic book legislation, namely, the manner of depiction and the approach of the comic book. The same objection applies to the exclusion from the ordinance of all depictions of crimes which are culled from religious writings. This exemption has no justification when considered in the light of the purpose of the ordinance.

Likewise, the exemption provided for newspaper comic strips is without justification. Although a newspaper would be perfectly free to circulate a fictional portrayal of crime, a comic book which followed the frequent practice of reprinting newspaper comic strips would be banned. Unlike the exemptions for accounts of crime that are true or drawn from religious writings, this latter one is not based on content, nor is it a completely different form of presenting a story. Rather, the exemption is based solely on the nature of the product produced on paper. (*Cf. Morey* v. *Doud,* 354 U.S. 457, 466 et seq. [77 S.Ct. 1344, 1 L.Ed.2d 1485].)

*Fourth.* The ordinance fails to establish a clearly defined standard of guilt.

Both the California Constitution, article I, section 13, and the Constitution of the United States, Fourteenth Amendment, provide that no person shall be deprived of life, liberty, or property without due process of law. Due process means that "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (*Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888]; *In re Porterfield,* 28 Cal.2d 91, 120 [168 P.2d 706, 167 A.L.R. 675].)

The standard to be applied is set forth in *Connally* v. *General Const. Co.,* 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322] : "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

Section 4a of the ordinance defines a crime comic book as "Any book, magazine, or pamphlet in which an account of crime is set forth by means of a series of five (5) or more

drawings or photographs, in sequence, which are accompanied by either narrative writing or words represented as being spoken by a pictured character. . . ." This definition embraces what is commonly known as a comic book, but it goes further. Books are included; so are accounts which utilize photographs; narrative writing as well as dialogue is included.

There are on the market numerous children's books of fairy tales and folk tales, containing illustrations interspersed with dialogue or narration. If such portrayals are "in sequence" as defined by section 4b of the ordinance, they may fall within the prohibition of the ordinance. To outlaw these traditional and innocuous storybooks because of a desire to eliminate the seamy and gory in comic books is going far beyond any demonstrable need. Yet if such books are not within the ban, by what standard can a parent or newsdealer determine where to draw the line?

The exact term in the ordinance is "account of crime." Although the draftsman carefully spelled out which crimes he meant, we are not told what constitutes an "account." "Account" is defined in Webster's New International Dictionary (2d ed. 1957) as "a statement of facts or occurrences; a relation or narrative; report; description; as, an *account* of a battle." Suppose the crime is committed before the story opens, but a policeman reports to his superior the evidence he has found and the rest of the story is devoted to the chase. If this is an "account," all detective stories would be barred, even though they do not picture the criminal in the act of committing the crime, if there are five or more drawings or photographs in sequence, depicting the "account."

Section 4a of the ordinance requires that the "account" of crime be set forth in five or more panels, but what does "account" include? If the criminal takes only one or two panels to kill his victim, although the entire story may deal with his subsequent detection, is this portrayal within the ordinance?

These questions point up the ambiguity which leaves a distributor unable to determine whether comic books in his possession subject him to criminal liability.

It is uncertain what acts constitute the crime prohibited by the ordinance. Clearly, the ordinance attempts to prohibit the selling of crime comic books to children, or offering or attempting to sell, giving, furnishing or exhibiting crime comic books to children. It is not clear, however, whether plaintiffs are subjecting themselves to arrest for keeping

crime comic books on their shelves for sale to adults. Assuming that such an exhibit of comics to adults is not permissible, the ordinance falls squarely within the doctrine announced in *Butler* v. *Michigan*, 352 U.S. 380 [77 S.Ct. 524, 1 L.Ed.2d 412].

Assuming, on the other hand, that an exhibit of comics to adults is permitted under the ordinance, no clear provision is made to warn plaintiffs when such an exhibit falls within the ban. Perhaps the distributor is in violation as soon as a child walks over to the rack and glances through a crime comic book. Under any circumstances, dealers in comic books should not be required to hazard assumptions and guesses as to the meaning of the ordinance.

Section 4c of the ordinance says that a crime comic includes depiction of "acts by human beings, and further includes acts by animals or any nonhuman, part human, or imaginary beings, which if performed by a human would constitute any of the crimes named." Comic book characters are frequently portrayed as human, except for some insignificant animal features, such as big ears, or a victim may be imaginary although close to human form because he is the inhabitant of another planet. The problem thus arises, when does an animal commit a crime on a human? If the ordinance is taken literally, every time an animal acts toward a human in a way that would constitute a crime if the animal were human, the portrayal comes under the ordinance. This "as if" test would make an "account of crime" out of a person's losing an arm to a shark, since if the shark were human its act would constitute cannibalism or mayhem, or to a dog's eating some food found on a person's porch, since if the dog were human its act would constitute theft.

The ordinance as written is entirely too uncertain and "leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." (*United States* v. *Cohen Grocery Co.*, 255 U.S. 81, 89 [41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045].)

The judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Peters, J., concurred.

Spence, J., concurred in the judgment.

Respondents' petition for a rehearing was denied July 22, 1959.