[Sac. No.7682.   In Bank.   Mar. 2, 1966.]

S. L. WEAVER et al., Plaintiffs and Respondents, v. FRANK M. JORDAN, as Secretary of State, etc., Defendant and Appellant.

Thomas C. Lynch, Attorney General, Charles A. Barrett, Assistant Attorney General, and James Ganulin, Deputy Attorney General, for Defendant and Appellant.

Loeb & Loeb and Herman F. Selvin as Amici Curiae on behalf of Defendant and Appellant.

Nossaman, Waters, Scott, Krueger & Riordan, William L. Scott, Allan Browne and Hughes, Hubbard, Blair & Reed for Plaintiffs and Respondents.

O'Melveny & Myers, Pierce Works, William D. Moore, James D. Lorenz, Jr., Marshall W. Krause, Robert M. O'Neil and Melvin L. Wulf as Amici Curiae on behalf of Plaintiffs and Respondents.

BURKE, J.—Defendant appeals from an adverse judgment in a declaratory relief action which attacks as unconstitutional

an initiative measure adopted by the electorate at the November 1964 general election, and entitled by its proponents and draftsmen the "Free Television Act" (hereinafter "the Act"). Designated as Proposition 15 on the ballot, the Act undertakes to ban in California the business of home subscription television. For reasons which will appear, we have concluded that the trial court correctly determined the Act to be invalid as an abridgment of the free speech guaranties of state and federal Constitutions.

The provisions of the Act are set forth in full in the margin.[1] Following its effective date plaintiffs as incorporators tendered to defendant Secretary of State for filing (with the requisite fees) certain articles of incorporation for the formation of a corporation to be named Advanced Tele-Communications, Inc. (hereinafter TC), for the purpose of engaging in

[1] AN ACT TO PRESERVE FREE TELEVISION IN CALIFORNIA. The People of the State of California do enact as follows:

Section 1: This Act shall be known and may be cited as the FREE TELEVISION ACT.

Section 2: The public has heretofore had available to it over existing television stations and privately owned receiving sets many different categories of free television programs, including telecasts of sporting events, political discussions, original dramatic presentations, variety programs, news programs, motion pictures and other programs of interest. The development of television in the United States has been based upon the public policy of making proper use in the public interest of existing television channels, and providing a broad range of interesting and informative programs free of charge to the viewing public. The information, instruction and entertainment derived from such programs are in the public interest. The development of any subscription television business would have an adverse effect upon presently licensed television stations which do not make a charge to viewers; and would tend to deprive the members of the public, who have made a substantial investment in television receiving equipment, of their present freedom of choice with respect to television programs, and of the information, instruction and entertainment now readily and freely available to them. It would tend to create a monopoly. For those and related reasons it would be contrary to the public policy of this State.

Section 3. The public shall have the right to view any television program on a home television set free of charge regardless of how such program is transmitted, whether in whole or in part by wires, lines, radio waves, waveguides, coaxial cable, microwave transmitters or other electronic or mechanical means or any combination thereof; and no person shall, directly or indirectly, make a charge inconsistent with such right. "Television program" includes any program of a category, form, kind, nature or type substantially similar to any category, form, kind, nature or type which was transmitted on or before the effective date hereof free of charge for reception on home television sets. "Home television set" includes any electronic or electrical device generally or customarily used for the reception of television programs in the home.

Section 4: The following contracts, agreements, or understandings, where inconsistent with such free transmission, are absolutely void and are not enforceable: (a) those made or executed after the effective date of this Act, and (b) those in existence on such effective date to the extent that they are executory.

the home subscription television business.[2] Defendant refused to file the articles on the grounds (1) they did not conform to law in that they provided that the proposed corporation was to engage in an unlawful business, and (2) the purposes of the proposed corporation were unlawful in that they are

Section 5: Any person who is injured by the violation of this Act may recover threefold any damages and may enjoin such violation and shall be entitled, in addition, to his costs of suit and reasonable attorneys fees.

Section 6: This Act shall not apply to community antenna systems or to hotel or apartment antenna systems, where no charge is made to the viewer based upon or related to program content, or to non-profit educational television systems, whether closed or open circuit.

Section 7: If any section, sentence or clause of this Act is adjudged to be unconstitutional or invalid, such adjudication shall not affect the validity of the remaining portion of this Act. It is hereby declared that this Act, and each section, sentence or clause thereof, would have been passed, irrespective of the fact that any one or more sections, sentences or clauses might be adjudged to be unconstitutional or for any other reason invalid. If any part of this Act is invalid in one or more of its applications, that part nevertheless remains in effect in all valid applications. It is the intention in this Act in respect of its subject matter to exercise the power of the State to the full extent of its constitutional power; and so, this Act shall be applicable to that extent regardless of any limitations of its applicability on the ground of a want of constitutional power.

Section 8: Chapter 5 of the First Extraordinary Session of 1963, codified as Part 15 of Division 2 of the Revenue and Taxation Code, together with all other acts which may be in conflict herewith, is hereby repealed.

[2] The articles of incorporation state in article SECOND that ''The purposes for which this corporation is formed are:

''a) To engage exclusively in the business of subscription television in California.

''b) To transmit television programs for viewing on home television sets by means of wires, lines, coaxial cable, or any combination thereof, and to make a direct charge upon subscribers for the right to view such television programs. As used in these articles, the words 'television programs' include any program of a category, form, kind, nature or type substantially similar to any category, form, nature or type which was transmitted on or before December 7, 1964, free of charge for reception on home television sets; the words 'home television sets' include any electronic or electrical device generally or customarily used for the reception of television programs in the home.

''c) To establish a subscription television system or systems in California and to transmit or transport to California for viewing over its system or systems a substantial number of television programs and attractions made and originated in states other than California.

''d) To have and to exercise all powers conferred by the laws of California upon corporations formed under the laws pursuant to and under which this corporation is formed, as such laws are now in effect and at any time after may be amended; provided, however, that this corporation shall exercise powers only incidental with the purposes expressly set forth in subparagraphs (a) through (c), inclusive, of this Article SECOND; provided, further, that nothing in this Article SECOND shall be construed as authorizing this corporation to establish or operate any community, hotel, or apartment antenna system or systems where no charge is made to the viewer based upon or related to program content, or any non-profit educational television system or systems, whether closed or open circuit.''

proscribed by the Act. (See Corp. Code, § 300.) Plaintiffs thereupon brought this action for declaratory relief, contending that the Act violates both the federal and state Constitutions.

Defendant answered and moved for judgment on the pleadings, and plaintiffs moved for summary judgment. Defendant's answer admits the matters already related in this opinion, but for lack of information or belief denies generally further allegations of the complaint which set forth the business plans and intentions of the proposed corporation, that several "theatre subscription businesses" are now operating in California, and that the Act exempts such businesses from its provisions.[3] The trial court concluded that the Act abridges both the state and federal constitutional guaranties of free speech. (U.S. Const., Amendments I and XIV; Cal. Const., art. I, § 9.) Accordingly, plaintiffs' motion for summary judgment was granted, and defendant's motion for judgment on the pleadings was denied. From the ensuing judgment

---

[3]More specifically, the allegations so denied are that TC, the proposed corporation, plans and intends as follows:

"8. . . . to engage in the business of subscription television and to establish a subscription television system in the State of California.

"9. . . . to establish a closed circuit subscription television system. Programs transmitted by [TC] will be disseminated to the individual premises of subscribers over coaxial cable network channels leased from telephone companies. Individual subscribers will be connected to the coaxial cable network by a 'coaxial drop' leading to the subscriber's television set. No modification of subscribers' sets is required. Reception of television programs transmitted by others will not be affected by said . . . system.

"10. . . . initially subscribers will be able to select during hours of transmission one of three subscription television channels or music supplied by [TC].

"11. . . . to present over . . . said system sporting events, current motion pictures, plays, educational programs, and other special programs and attractions to subscribers. Each subscriber will pay a program charge for programs he may choose to view. [TC] does not intend to transmit commercial advertising over its said system; [TC] intends that its primary source of revenue will be fees received from subscribers.

"12. . . . to transmit for viewing over its said system a substantial number of programs and attractions made and originated in states other than California; said programs and attractions will be transported or transmitted by or on behalf of [TC] from said states to California."

Also denied is the following allegation: At present several companies and individuals are conducting businesses in California which are "engaged in presenting special attractions and programs, including sporting events, to individual viewers by a closed circuit coaxial cable network leased by said businesses from telephone companies ("theater subscription television"); said programs and special attractions are presented and viewed at theaters; each viewer pays a charge based upon program content to the owners of said businesses for the privilege of viewing said attractions and programs. Said initiative exempts . . . 'theatre subscription television' businesses from its provisions."

declaring the duty of defendant to accept and file the tendered articles of incorporation, this appeal was taken. (Code Civ. Proc., § 437c.)

First Amendment freedoms of press, speech and religion are protected by the due process clause of the Fourteenth Amendment from invasion by state action. (*Smith* v. *California* (1959) 361 U.S. 147, 149-150 [80 S.Ct. 215, 4 L.Ed.2d 205, 209]); *Near* v. *Minnesota* (1931) 283 U.S. 697, 707 [51 S.Ct. 625, 75 L.Ed. 1357]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [1] [40 Cal.Rptr. 69, 394 P.2d 813]; *Katzev* v. *County of Los Angeles* (1959) 52 Cal.2d 360, 365 [1a], 366 [4] [341 P.2d 310].) Such rights have a paramount and preferred place in our democratic system, and the " 'rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice.' " (*American Civil Liberties Union* v. *Board of Education* (1961) 55 Cal.2d 167, 178-179 [9-10] [10 Cal.Rptr. 647, 359 P.2d 45, 94 A.L.R.2d 1259], quoting from *Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [65 S.Ct. 315, 89 L.Ed. 430].) Accordingly, the courts have declared that any system of prior restraints of expression comes before the courts " 'bearing a heavy presumption against its constitutional validity.' " (*Freedman* v. *Maryland* (1965) 380 U.S. 51, 57-58 [85 S.Ct. 734, 13 L.Ed.2d 649]; *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [83 S.Ct. 631, 9 L.Ed.2d 584].)

The fact that the Act now before us was adopted as an initiative measure by the general electorate does not alter our approach to the claim of First Amendment infirmity. In *West Virginia State Board of Education* v. *Barnette* (1943) 319 U.S. 624, 638 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], the court pointed out that "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." (See also *Wallace* v. *Zinman* (1927) 200 Cal. 585, 593 [5] [254 P. 946, 62 A.L.R. 1351].)

Inasmuch as the rights of free speech and press are worthless without an effective means of expression, the guaranty extends to both the content of the communication and

242

the means employed for its dissemination. (*Wollam v. City of Palm Springs* (1963) 59 Cal.2d 276, 284 [5] [29 Cal.Rptr. 1, 379 P.2d 481]; *Kovacs v. Cooper* (1949) 336 U.S. 77 [69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608]; *Saia v. New York* (1948) 334 U.S. 558 [68 S.Ct. 1148, 92 L.Ed. 1574].)

■ Communication by motion picture, by radio and by television falls within the constitutional protection. (*Freedman v. Maryland, supra* (1965) 380 U.S. 51, 57; *Superior Films, Inc. v. Department of Education* (1954) 346 U.S. 587 [74 S.Ct. 286, 98 L.Ed. 329]; *Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 499-502 [72 S.Ct. 777, 96 L.Ed. 1098]; *Public Utilities Com. v. Pollak* (1952) 343 U.S. 451, 461-462 [72 S.Ct. 813, 96 L.Ed. 1068]; *Baltimore Radio Show v. State* (1949) 193 Md. 300, 323 [67 A.2d 497, 507], cert. den. (1949) 338 U.S. 912 [70 S.Ct. 252, 94 L.Ed. 562]; *Rumely v. United States* (D.C. Cir. 1952) 197 F.2d 166, 177 [90 App. D.C. 382]; *American Broadcasting Co. v. United States* (D.C.S.D.N.Y. 1953) 110 F.Supp. 374, 389, affd. on other grounds (1954) 347 U.S. 284 [74 S.Ct. 593, 98 L.Ed. 699]; *Wrather-Alvarez etc., Inc. v. Hewicker* (1957) 147 Cal.App.2d 509, 512 [5] [305 P.2d 236].)

■ "The right of freedom of speech and press includes not only the right to utter or to print, but the right to *distribute,* the right to *receive,* the right to read . . . ." (Italics added.) (*Griswold v. Connecticut* (1965) 381 U.S. 479, 482 [85 S.Ct. 1678, 14 L.Ed.2d 510]; see also *Martin v. Struthers* (1943) 319 U.S. 141, 143 [63 S.Ct. 862, 882, 87 L.Ed. 1313]; *Marsh v. Alabama* (1946) 326 U.S. 501, 505-508 [66 S.Ct. 276, 90 L.Ed. 265]; *Grosjean v. American Press Co.* (1936) 297 U.S. 233, 250 [56 S.Ct. 444, 80 L.Ed. 660]; *Zeitlin v. Arnebergh* (1963) 59 Cal.2d 901, 907 [1] [31 Cal.Rptr. 800, 383 P.2d 152].) ■ Also encompassed are amusement and entertainment as well as the exposition of ideas. "The line between the informing and the entertaining is too elusive for the protection of that basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine." (*Winters v. New York* (1948) 333 U.S. 507, 510 [68 S.Ct. 665, 92 L.Ed. 840].)

The Act now at issue purports to totally prohibit home subscription television. We are told that subscription television consists of the origination and transmission of programs to subscribers, that programs may be transmitted either by radiowave ("open circuit") or cable ("closed circuit"). The Act undertakes to ban both methods of transmission when a charge is made to home viewers (Act, § 3, *ante,* fn. 1), but

does not forbid making a charge therefor when the viewing is by audiences in a theatre. Thus the Act is entirely clear that no one may speak or disseminate ideas to the home through the medium of pay television, and, likewise, that no one in the home may listen to a pay television transmission or receive transmitted ideas or images conveying such ideas over the outlawed medium. The suppression of the proscribed medium as a vehicle of transmission to the home purports to be absolute; it amounts to total censorship, in advance, so far as home viewers are concerned.

The chief and crucial difference between presently existing home television in California, and subscription television, is the method of collecting revenues: with rare exceptions[4] existing home television collects its revenues from commercial advertisers; subscription television collects its revenues from subscribers. This difference provides the means by which the Act undertakes to effectively prohibit home subscription television, while at the same time imposing no bans against theatre subscription television or against existing home television which derives its financial support from commercial advertisers.[5]

When a restriction of a First Amendment freedom is of such unlimited potential scope it may be imposed only to avoid a "clear and present danger" that a substantive evil will otherwise result which the state has a right to prevent. The weighing of interests which the courts have at times found necessary or appropriate when considering a restriction more narrow in language or in application[6] may be dispensed with if, as here, the enactment is so broad as to impose a complete ban of expression and communication through a specified

---

[4]We have in mind the occasional "educational" station supported at least in part by voluntary contributions from viewers.

[5]We are also told that a significant and identifying characteristic of home subscription television from the viewer's standpoint is that he will have a much greater choice in the selection of programs transmitted over subscription television systems, than over existing systems; that in subscription television there is a direct correlation between program content and revenue collected; that obviously, if subscribers do not like the subject matter of programs they will not pay to see them and the revenue of the subscription television station is immediately diminished; that consequently it will be the viewer, not the sponsor, who selects the programs broadcast over subscription television systems.

[6]See Breard v. City of Alexandria (1951) 341 U.S. 622, 644 [71 S.Ct. 920, 95 L.Ed. 1233, 35 A.L.R.2d 335]; Martin v. Struthers, supra (1943) 319 U.S. 141, 143; West Virginia State Board of Education v. Barnette, supra (1943) 319 U.S. 624, 630, 633-634; cf. Kovacs v. Cooper, supra (1949) 336 U.S. 77, 88-89.

244

medium, in this case home subscription television.[7] ▅ In the event this court determines that there is such a "clear and present danger" of a substantive evil warranting the suppression of the constitutional guaranty of freedom of speech or press, it will then be necessary that we also determine whether the gravity of any such "evil," discounted by its improbability, "justifies" invasion of freedom of speech in order to avoid the "danger." (*Katzev* v. *County of Los Angeles, supra* (1959) 52 Cal.2d 360, 366, and cases there cited; see also *Dennis* v. *United States* (1951) 341 U.S. 494, 510, 513-514 [71 S.Ct. 857, 95 L.Ed. 1137]; *West Virginia State Board of Education* v. *Barnette, supra* (1943) 319 U.S. 624; *American Civil Liberties Union* v. *Board of Education, supra* (1961) 55 Cal.2d 167, 175-176; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 542 [1], 545 [3] [171 P.2d 885].)

In *Thomas* v. *Collins, supra* (1945) 323 U.S. 516, 530, the court declares that "the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment . . . gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. [Citation.]

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. . . . Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." (See also *American Civil Liberties Union* v. *Board of Education, supra* (1961) 55 Cal.2d 167, 178-179.)

▅ Any suggestion of the existence of a "clear and present danger" to be obviated by the Act here involved would be utterly specious. The Act itself states (in § 2) that the "development" of the subscription television business would have an "adverse effect" upon existing television stations—a proposition which at the very least is debatable. The further declarations of the Act (§ 2) that subscription television "would tend" to deprive viewers of their "freedom of choice," and of the "information, instruction and enter-

[7]See *Canon* v. *Justice Court* (1964) 61 Cal.2d 446, 455-456, 459-460 [6b] [39 Cal.Rptr. 228, 393 P.2d 428]; cf. *People* v. *Woody, supra* (1964) 61 Cal.2d 716, 727 [3b].

tainment now readily and freely available to them," and would "tend" to create a monopoly, likewise appear of uncertain veracity or validity. But even if such declarations be accepted as unquestionable facts, they would demonstrate no clear and present danger of any substantive evil to be avoided by the sweeping and absolute suppression attempted by the Act. Rather, as the trial court commented in its memorandum opinion herein, any suggested "evil" appears to be speculative and illusory, and well discounted by "improbability" by the recitals of the Act itself. In the event that one medium of communication and entertainment actually did in part supplant or displace its competitor in the course of exercising protected freedoms of press and speech, that is only the traditional and expected possible consequence of free choice in turn by viewing or listening members of the public of the communications they wish to receive. If monopoly practices appear or if the public interest actually suffers or is ignored it will then be time enough to apply appropriate regulation within constitutionally permissible limits. (See *National Broadcasting Co.* v. *United States* (1943) 319 U.S. 190, 226 [63 S.Ct. 997, 87 L.Ed. 1344].) ▆▆▆ But the outright ban here undertaken by the Act cannot stand. As pointed out in *Wollam* v. *City of Palm Springs, supra* (1963) 59 Cal.2d 276, 284 [7], "the right to regulate [a means of communication] does not necessarily sanction the outright prohibition."[8] And as stated in *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [81 S.Ct. 247, 5 L.Ed.2d 231], "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."[9]

▆▆▆ Further, the freedoms of speech and of press protected by the First Amendment rest on "the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society."

[8]See also *National Assn. for Adv. of Colored People* v. *Alabama* (1964) 377 U.S. 288, 307-308 [84 S.Ct. 1302, 12 L.Ed.2d 325]; *Kovacs* v. *Cooper, supra* (1949) 336 U.S. 77, 81-88; *Talley* v. *California* (1960) 362 U.S. 60, 64 [80 S.Ct. 536, 4 L.Ed.2d 559].

[9]See also *Speiser* v. *Randall* (1958) 357 U.S. 513, 526 [78 S.Ct. 1332, 2 L.Ed.2d 1460], in which the court held unconstitutional a requirement of a loyalty "declaration" as a condition of tax exemption, stating: "In practical operation . . . this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free."

246

(*Associated Press* v. *United States* (1945) 326 U.S. 1, **20** [65 S.Ct. 1416, 89 L.Ed. 2013] ; see also *Griswold* v. *Connecticut, supra* (1965) 381 U.S. 479, 482.)

The assertion of defendant and of amici curiae that the Act does not invade freedom of expression because it does not prohibit subscription television, but merely forbids direct charges for programs transmitted to the home, is devoid of substance. The trial court correctly observed that ''This is comparable to asserting that no prohibition of expression would exist in the case of newspapers or motion pictures if a statute were adopted requiring their distribution or showing without charge.'' When expression protected by the First Amendment is involved, ''It is of course no matter that the dissemination takes place under commercial auspices.'' (*Smith* v. *California, supra* (1959) 361 U.S. 147, 150.)[10] In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 265-266 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], it was recently held that a publication which communicates information, expresses opinion, recites grievances, and protests claimed abuses, is not removed from the protection of free speech and press guaranties by the fact that it appears as a paid advertisement in a newspaper. The court there declared ''That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold [citations].'' (Cf. *Breard* v. *City of Alexandria, supra* (1951) 341 U.S. 622, 642; *Joseph Burstyn, Inc.* v. *Wilson, supra* (1952) 343 U.S. 495, 501-502; *Bantam Books, Inc.* v. *Sullivan, supra* (1963) 372 U.S. 58, 64, fn. 6; see also 53 Cal.L.Rev. 1418-1425.)[11]

Our holding that no basis has been shown or suggested which would warrant the sweeping restriction here attempted by the Act is not, of course, repugnant to the ac-

---

[10]See also *Near* v. *Minnesota, supra* (1931) 283 U.S. 697, 720 (''Characterizing the publication [of malicious, scandalous and defamatory matter in newspapers] as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint''); *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81] (that a religious organization solicited ''purchase'' of its books and pamphlets did not weaken its right to First Amendment protection).

[11]The dissemination of protected expression under commercial auspices is of course to be distinguished from the dissemination of ''purely commercial'' communications such as mercantile advertising—which do not enjoy the First Amendment protection otherwise accorded. (See *Murdock* v. *Pennsylvania, supra* (1943) 319 U.S. 105, 110-111; *Valentine* v. *Chrestensen* (1942) 316 U.S. 52, 55 [62 S.Ct. 920, 86 L.Ed. 1262]; *New York Times Co.* v. *Sullivan, supra* (1964) 376 U.S. 254, 266.)

cepted principle that the practices or business of the various media of expression or of those disseminating their beliefs or ideas may be regulated or taxed in a reasonable and non-discriminatory manner.[12] Thus the antitrust proscriptions of the Sherman Act were held applicable to newspapers, with the comment by the court that "Freedom to publish means freedom for all and not for some," a comment also appropriate in the instant case. (*Associated Press* v. *United States, supra* (1945) 326 U.S. 1, 7, 19-20; see also *Lorain Journal Co.* v. *United States* (1951) 342 U.S. 143 [72 S.Ct. 181, 96 L.Ed. 162].) The Fair Labor Standards Act and the National Labor Relations Act have likewise been applied to the newspaper business. (*Oklahoma Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186, 192-193 [66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531]; *Mabee* v. *White Plains Pub. Co.* (1946) 327 U.S. 178, 184 [66 S.Ct. 511, 90 L.Ed. 607]; *Associated Press* v. *National Labor Relations Board* (1937) 301 U.S. 103, 130 [37 S.Ct. 650, 81 L.Ed. 953].) In *Kovacs* v. *Cooper, supra* (1949) 336 U.S. 77, an ordinance was sustained which barred sound trucks from broadcasting in a *loud and raucous manner* on the streets.[13]

And in *Breard* v. *City of Alexandria, supra* (1951) 341 U.S. 622, a local ordinance denominating a nuisance and prohibiting door-to-door solicitation of orders for goods, *without previous request* by the occupant of the home, was sustained against First Amendment attack as applied to one selling magazines. By contrast, in *Martin* v. *Struthers, supra* (1943) 319 U.S. 141, 142, an ordinance which made it "unlawful for any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon" householders to their door "for the purpose of receiving" such material, was held invalid as applied to one distributing advertisements for a religious meeting. ▮ The holdings of *Breard* and *Struthers* are particularly apt in pointing up the infirmity of the Act now before us. That Act attempts, absolutely and completely, to deprive householders of the *right to receive* communications from home subscription television (*Struthers*),

---

[12]See *Murdock* v. *Pennsylvania, supra* (1943) 319 U.S. 105, 110; *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232 [163 P.2d 704], appeal dism. 331 U.S. 543 [67 S.Ct. 1428, 91 L.Ed. 1662]; *City of Corona* v. *Corona etc. Independent* (1953) 115 Cal.App.2d 382, 390 [252 P.2d 56], cert. den. 346 U.S. 833 [74 S.Ct. 2, 98 L.Ed. 356].

[13]Cf. *Saia* v. *New York, supra* (1948) 334 U.S. 558, striking down as overbroad an ordinance prohibiting the use of sound amplifiers in public places without permission from the chief of police, where no standards were prescribed for the exercise of that official's discretion.

whereas under no circumstances does it appear that such communications could intrude into their homes absent their request via a subscription (*Breard*).

*Grosjean* v. *American Press Co., supra* (1936) 297 U.S. 233, likewise lends support to the views we have expressed with respect to the Act. In *Grosjean* a statute which imposed a 2 percent tax upon the gross receipts of newspapers making a "charge" for advertising and having a circulation of over 20,000 copies per week, was held to be an unconstitutional impairment of First Amendment rights. The court reasoned that the statute was "a deliberate and calculated device in the guise of a tax" which had the effect of curtailing revenue and of restricting circulation, and thus of limiting "the circulation of information to which the public is entitled in virtue of the constitutional guaranties." (Pp. 244-245, 250, of 297 U.S.) Further, states the opinion, "It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press. . . . The tax here involved is bad not because it takes money from the pockets of the appellees" but because of its effect of restricting the dissemination of information to the public.[14] The Act before this court in the present case would not only *curtail* revenues, as in *Grosjean,* but would utterly prohibit collecting them from home subscribers; it thus constitutes a complete ban on the establishment of a home subscription television system in California, and, consequently, on the disseminating of speech, ideas, and entertainment over such a system. As already stated, a suppression so sweeping in its scope can be sustained only to prevent a "clear and present danger" that there would otherwise be brought about "substantive evils" against which the state has a right to protect. No such "danger" or "evils" are shown here.

In this connection we note further that the radio and television regulation sustained in National Broadcasting Co. v. United States, supra (1943) 319 U.S. 190 (and other cases which followed) upon which defendant relies, was limited to certain rules of the Federal Communications Commission gov-

---

[14]See also *Sun Pub. Co.* v. *Walling* (6th Cir. 1944) 140 F.2d 445, 449 ("No case has been cited and none has been found . . . which holds that a newspaper may be barred from the channels of commerce as a means of effectuating an administrative regulation, or a court decree enforcing an administrative order."); *City of Baltimore* v. *A. S. Abell Co.* (1958) 218 Md. 273 [145 A.2d 111, 119].

erning the selection of programs—rules whose purpose was to *avoid* practices which would hinder growth of new networks and would deprive the listening public in many areas of service and would deprive local stations of much of their choice of programs. (Pp. 198-209.) The court points out, among other things, that the FCC rules had been authorized by a Congress fearful that "in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." (P. 219 of 319 U.S.) ▇ We are convinced that the sweeping suppression of home subscription television, as attempted by the Act now before us, would, contrary to the Act's declarations, encourage and foster monopolistic domination by existing television stations deriving their financial support from commercial advertisers. (See fn. 11, *ante.*) Monopoly in the field of communication can best be avoided by permitting the growth of that field of endeavor in directions and through media which will provide the widest possible range and choice of ideas and of expression.

Our conclusion that the Act violates the free speech and press guaranties renders it unnecessary to discuss plaintiffs' further contention that it likewise imposes an arbitrary classification in violation of the equal protection clauses of the federal and state Constitutions.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

MOSK, J.—I dissent.

My learned colleagues have determined that the initiative enactment at hand must fall, and they cite a plethora of First Amendment cases in support of their conclusion. No one can denigrate either the citations or the revered constitutional principles they enunciate. They are indeed irrefutable. If this were a freedom of speech case, the majority opinion would be unassailable, and I would join in it.

As I see it, however, my associates are vanquishing an illusory adversary. The target here is not speech; it is merely a matter of dollars and cents and the power of the people of the state to decide who gets them.

The majority opinion accurately points out that the "chief and crucial difference between presently existing home television in California, and subscription television, is the

method of collecting revenues." I find it difficult to make the leap from that crucial difference, the method of collecting revenue—an economic choice purely and simply—to the fundamentals of free speech and to the conspiratorial absolutes of "suppression" and "total censorship" feared by my colleagues. There is a vast chasm between the economic element at hand and the apparition of government censorship. The majority opinion fails to convincingly bridge that gap.

There is nothing in the Act in question which prohibits or restricts in any way the holding, expression, publication, or dissemination of any opinion, view, idea, thought, or belief. There is no circumscription whatsoever on the content of any communication, oral or written. The Act prohibits only a charge imposed upon persons in their homes to hear or see communications when disseminated by means of coaxial cables or through the airwaves, which Congress has determined to be in the public domain.[1]

The nucleus of the Act is found in its section 3, which asserts that the "public shall have the right to view any television program on a home television set free of charge" and "no person shall, directly or indirectly, make a charge inconsistent with such right." Neither that section, nor any other part of the Act, purports to circumscribe in any manner the content or character of programs, or the manner of communication thereof. The gravamen is the *charge* for serving home television sets.

*The First Amendment guarantees freedom of speech; it does not guarantee the right to be paid for exercise of that freedom.* Since the Act goes only to the element of compensation, not to the right of expression, the First Amendment is irrelevant in the case at hand.[2] (See *Associated Press v. United States* (1945) 326 U.S. 1, 20 [65 S.Ct. 1416, 89 L.Ed. 2013]; *National Broadcasting Co. v. United States* (1943)

---

[1]On February 15, 1966, the Federal Communications Commission purported to extend its jurisdiction to include regulation of virtually all forms of community antenna television. This portends a future question of federal preemption.

[2]Although a free speech violation was not reached in the majority opinion in *United States v. C.I.O.* (1948) 335 U.S. 106 [68 S.Ct. 1349, 92 L.Ed. 1849], the concurring opinion of Justice Rutledge, at page 155, contains this interesting observation on the reverse of the point involved here: "The [First] Amendment did not make its protections turn on whether the hearer or reader pays, or can pay, for the publication or the privilege of hearing the oral or written pronouncement. Neither freedom of speech and the press nor the right of peaceable assembly is restricted to persons who can and do pay."

319 U.S. 190, 226-227 [63 S.Ct. 997, 87 L.Ed. 1344]; *Lorain Journal Co.* v. *United States* (1951) 342 U.S. 143, 155-156 [72 S.Ct. 181, 96 L.Ed. 162].) Nevertheless, I shall discuss several First Amendment tests that have been and can be applied and, as will be seen, under each of them this enactment fails to offend constitutional sensibilities.

First of all, it appears that the majority finds this Act presumptively unconstitutional, ignoring the well-established rule that a legislative enactment is presumed to be valid and that persons adversely affected must sustain the burden of demonstrating constitutional intrusion.[3] Neither First nor Fourteenth Amendment cases alter the basic principle. As Justice Frankfurter wrote in a concurring opinion in *Kovacs* v. *Cooper* (1949) 336 U.S. 77, 94-95 [69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608]: "the claim that any legislation is presumptively unconstitutional which touches the field of the First Amendment and the Fourteenth Amendment, insofar as the latter's concept of 'liberty' contains what is specifically protected by the First, has never commended itself to a majority of this Court."

Justice Douglas has explained the reason "why First Amendment rights are often said to have a preferred position in our constitutional scheme. They are preferred because the Constitution, as construed, protects them against abridgment by either the States or the federal government. Few other provisions of the Bill of Rights have ever been applied in full force to the States." (Douglas, An Almanac of Liberty (1954) p. 123.)

That concept of "preference" is vastly different from the theory of unlimited precedence casually stated in many opinions and articles, and now the basis of considerable academic conflict. Professor Herbert Wechsler has suggested that "the 'preferred position' controversy hardly has a point—indeed, it never has been really clear what is asserted or denied to have preference over what. Certainly the concept is pernicious if it implies that there is any simple, almost mechanistic basis for determining priorities of values having constitutional dimension. . . ." (Wechsler, *Toward Neutral Principles of Constitutional Law* (1959) 73 Harv. L. Rev. 1, 25.)

In addition to denying presumptive unconstitutionality, Justice Frankfurter flatly denied the propriety of a "preferred position" for First Amendment cases in *Kovacs* v.

---

[3]See Harris, *Freedom and the Businessman* (1952) 37 Iowa L. Rev. 196, 200.

*Cooper* (1949) *supra*, 336 U.S. 77, 90 [concurring opinion]: "This is a phrase," he said somewhat contemptuously, "that has uncritically crept into some recent opinions of this Court. I deem it a mischievous phrase, if it carries the thought, which it may subtly imply, that any law touching communication is infected with presumptive invalidity."[4] Professor Paul A. Freund agrees with Frankfurter. In his book, The Supreme Court of the United States (1961) (at p. 75), he wrote: "Mr. Justice Frankfurter is right in cautioning against the epithet 'preferred position' for those freedoms if the epithet threatens to become a substitute for analysis."

Nevertheless, the majority appear to have invoked a presumption of unconstitutionality, and, having improvidently done so, next resort to the "clear and present danger" test. Here again, I respectfully suggest they have fallen into error.

To employ the "clear and present danger" test under these circumstances results in a far too broad interpretation of a time-honored phrase. Professor Freund wrote, in The Supreme Court of the United States, *supra* (at p. 44): "No matter how rapidly we utter the phrase 'clear and present danger,' or how closely we hyphenate the words, they are not a substitute for the weighing of values. They tend to convey a delusion of certitude when what is most certain is the complexity of the strands in the web of freedoms which the judge must disentangle."

Prevailing authority limits application of the "clear and present danger" rule to those cases involving restriction upon the *content* of speech, and the test is not apposite in situations in which there are "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise." (*Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 50-51 [81 S.Ct. 997, 6 L.Ed.2d 105]; to the same effect see *American Communications Assn.* v. *Douds* (1950) 339 U.S. 382, 396-397 [70 S.Ct. 674, 94 L.Ed. 925]; *Schenck* v. *United States* (1919) 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470].)

This court has recognized the foregoing distinction. In *Katzev* v. *County of Los Angeles* (1959) 52 Cal.2d 360, 366 [341 P.2d 310], a clear and present danger test was applied

---

[4]Frankfurter discussed the issue again in *Dennis* v. *United States* (1951) 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137], with reference to "shifting economic arrangements," an expression most apt to describe the conflict here between competing economic methods of communication.

to a county ordinance absolutely prohibiting the sale of comic books consisting of a crime theme to persons under 18 years of age. In subsequent cases, involving regulations and restrictions upon campaigning and political activities by officials, the court adopted a balancing test and eschewed application of either *Katzev* or a clear and present danger. (*Canon* v. *Justice Court* (1964) 61 Cal.2d 446 [39 Cal.Rptr. 228, 393 P.2d 428]; *Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]; *Kinnear* v. *City & County of San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391].) The rationale appears clear: in *Katzev* there was interference with content of the publication, whereas in the subsequent cases there was a mere tangential speech interference resulting from other governmental purpose.

Professor Thomas I. Emerson noted that same distinction in his formidable critique of First Amendment problems in 72 Yale L. J. (1963) 877. The clear and present danger doctrine "grew out of cases where the restriction at issue was a direct prohibition of expression by criminal or similar sanctions, and is of doubtful application to other kinds of interference with freedom of expression. . . . And where the regulation in question is not aimed directly at punishing a particular utterance but affects freedom of expression in a more generalized or indirect way, as in a tax law or a disclosure requirement, the issues are not framed in terms of whether a specific utterance creates a specific danger. In any event, the clear and present danger test has not been applied in such cases." (*Id.* at p. 911.)

We next come to application of one phase of the "balancing test." A First Amendment absolutist like Mr. Justice Black has conceded the present ascendancy of the so-called balancing test (e.g., his dissenting opinions in *Barenblatt* v. *United States* (1959) 360 U.S. 109, 140-144 [79 S.Ct. 1081, 3 L.Ed.2d 1115]; *El Paso* v. *Simmons* (1965) 379 U.S. 497, 517 [85 S.Ct. 577, 13 L.Ed.2d 446], and *Scales* v. *United States* (1961) 367 U.S. 203, 259 [81 S.Ct. 1469, 6 L.Ed.2d 782]). He appears to agree with the "cases suggesting that a law which primarily regulates conduct but which might also indirectly affect speech can be upheld if the effect on speech is minor in relation to the need for control of the conduct." (*Barenblatt* v. *United States, supra,* at p. 141.)

Under the balancing test it is no longer sufficient to establish a violation of the First Amendment by merely showing there has been some limitation on speech. (*American Civil*

254

*Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 210-211 [28 Cal.Rptr. 700, 379 P.2d 4].) If there is a reasonable legislative basis for the limitation, constitutional rights have not been denied. Alleged impairments of First Amendment rights are "balanced" by determining whether there is a reasonable relationship between the impairment and a subject of overriding and compelling state interest. (*Canon* v. *Justice Court* (1964) *supra,* 61 Cal.2d 446, 456.)

The ad hoc balancing theory originated in 1939 in *Schneider* v. *State,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155], and reached its ultimate definition in Chief Justice Vinson's opinion for the majority in *American Communications Assn.* v. *Douds* (1950) 339 U.S. 382, in which, at page 399 [70 S.Ct. 674, 94 L.Ed. 925], he wrote: "When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgment of speech, the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented."

A contention similar to that made by these respondents was argued in *Estes* v. *Texas* (1965) 381 U.S. 532 [85 S.Ct. 1628, 14 L.Ed.2d 543], in which television broadcasters maintained that there was an abridgment of the right of free press because they were prohibited from using television cameras during the course of a trial. A divided court held upon balancing the alternatives that there was no abridgement of the right of free press, and that the court in its discretion could determine that decorum necessitated exclusion of television broadcasters. Similarly, a recent rule adopted by the Judicial Council of California under the chairmanship of the Chief Justice bars photographers and cameramen from courtrooms solely in the interest of proper administration of justice. There is no imposition upon the free right of communication in such rule, even though it is prohibitory and not merely regulatory.

The Act involved here may be compared with statutes (Ed. Code, §§ 16561 et seq.) which permit use of public school buildings upon such terms and conditions as the governing school board deems proper. Many school boards refuse to permit admission charges for noneducational events, and others decline to authorize solicitation of funds by political or social users of school property. Education Code section 16562 requires a rental charge for "entertainments or meetings where admission fees are charged or contributions" sought for nonschool purposes. These economic restrictions

have never been interpreted as being a limitation upon the exercise of free speech. Certainly it is plain to see that a valid distinction exists in a schoolhouse between speech free to all listeners and speech available only for a monetary consideration. Equally arguable is a basic distinction between communications to the home without charge and communications to the home only upon payment of a fee. The key in each instance is not speech, nor the content thereof, but the economic factor.

The First Amendment does not exempt commercial enterprises, even though they be publishers or broadcasters, from regulation or prohibition in the manner to which other businesses may be subjected. "As the press has business aspects, it has no special immunity from laws applicable to business in general." (*Mabee* v. *White Plains Pub. Co.* (1946) 327 U.S. 178, 184 [66 S.Ct. 511, 90 L.Ed. 607]; see also *Oklahoma Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186, 192-193 [66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531].)

It is clear that broadcasting licenses may be denied, despite a First Amendment plea, if the company's past business practices were monopolistic in character (*Mansfield Journal Co.* v. *Federal Communications Com.* (D.C. Cir. 1949) 180 F.2d 28, 36), if the broadcaster made misrepresentations in his application for a license (*Independent Broadcasting Co.* v. *Federal Communications Com.* (D.C. Cir. 1951) 193 F.2d 900), or if the broadcaster violates standards prescribed by the Federal Communications Commission (*National Broadcasting Co.* v. *United States* (1943) *supra*, 319 U.S. 190, 226-227). The federal government has been held to have power to restrain broadcasting of false advertising without any question of abridgment of free speech. (*E. F. Drew & Co.* v. *Federal Trade Com.* (2d Cir. 1956) 235 F.2d 735, 739-740; *American Medicinal Products, Inc.* v. *Federal Trade Com.* (9th Cir. 1943) 136 F.2d 426, 427.)

These and numerous other decisions make it abundantly clear that the exercise of the police or similar governmental power to regulate business in the public interest is not precluded by the fact that the business activity is claimed to be generally within the protection of the First Amendment.

Laurent B. Frantz, in his article, *The First Amendment in the Balance* (1962) 71 Yale L. J. 1424, 1429, notes that the balancing test, according to *Schneider,* "should apply only to regulations of the time, place and manner of speaking which, though neutral, as to the content of speech, may unduly limit

the means otherwise available for communicating ideas to the public. As reformulated in *Douds*, it should apply only when the statute is construed as regulating conduct, and where the effect on speech is deemed both relatively minor and a mere incidental by-product of the conduct regulation.''

In applying a balancing to the instant case, we find on one side of the scale that free speech and its contents are unaffected; on the other side, commercial exploitation of speech in the sanctity of the home is prohibited in the public interest. In that balancing of values, no constitutional infirmity appears.

The majority declare that ''Inasmuch as the rights of free speech and press are worthless without an effective means. of expression, the guaranty extends to both the content of the communication and the means employed for its dissemination,'' citing *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276, 284 [29 Cal.Rptr. 1, 379 P.2d 481], *Kovacs* v. *Cooper* (1949) *supra,* 336 U.S. 77, and *Saia* v. *New York* (1948) 334 U.S. 558 [68 S.Ct. 1148, 92 L.Ed. 1574]. But *Wollam* is also authority for the proposition (at p. 284) that ''the selection of the means of communication and the use of such means is not limitless. The municipality may issue reasonable and necessary regulations as to such matters.'' *Saia* is not apposite, for there the ordinance gave unrestricted discretion to a chief of police to control dissemination of information. *Kovacs,* on the other hand, prohibited dissemination of ideas through loud sound trucks on public streets; this was held to be permissible. That the result was prohibition of speech instead of mere regulation was of little moment, said the court, for ''All regulatory enactments are prohibitory so far as their restrictions are concerned, and the prohibition of this ordinance as to a use of streets is merely regulatory.'' (336 U.S. at p. 85.) (Also see *Breard* v. *Alexandria* (1951) 341 U.S. 622, 641 [71 S.Ct. 920, 95 L.Ed. 1233, 35 A.L.R.2d 335], in which it was noted that ''Regulation necessarily has elements of prohibition.'')

*Kovacs* held that sound trucks could ''be utilized in places such as parks or other open spaces off the streets'' but not on public streets. It was contended that this amounted to a drastic curtailment of speech rights in a significant area, the streets of a city. The court held that this did not constitute ''restriction upon the communication of ideas or discussion of issues. . . .'' Similarly, in the instant case, the Act prohibits *charges* for television programs transmitted into the home; it does not prohibit transmitting the programs into the

home or charging for the programs in places other than the home. A distinction between the home and other places for economic purposes seems no more tenuous than the *Kovacs* distinction between public streets and public parks for use of loud sound trucks. Whether a persuasive basis exists for the classification reposes here, as it did in *Kovacs,* with the legislative process.

We next consider the enactment under the doctrine of economic due process,[5] even though since 1937, the Supreme Court of the United States has consistently repudiated the concept, perhaps somewhat restively of late. Professor Robert G. McCloskey suggests after exhumation of the doctrine that it should rest in peace. (McCloskey, *Economic Due Process and the Supreme Court: An Exhumation and Reburial,* Sup. Ct. Rev. (1962) pp. 34 et seq.) After *Ribnik* v. *McBride* (1928) 277 U.S. 350 [48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327], proclaimed its restrictions over "business affected with a public interest," the theory was totally repudiated by Justice Douglas, for a unanimous court, in *Olsen* v. *Nebraska* (1941) 313 U.S. 236 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R.. 1500]. There is no requirement, he said, that the state make out a case for the appropriateness of the law. "Differences of opinion on that score suggest a choice which 'should be left where . . . it was left by the Constitution—to the states and to Congress.' " (*Id.* at p. 246.) Following *Olsen,* the court made its views pellucid in several other decisions, notably *Day-Brite Lighting, Inc.* v. *Missouri* (1952) 342 U.S. 421 [72 S.Ct. 405, 96 L.Ed. 469]—in which it was said whether legislation "offends the public welfare" is not the business of the court—and *Williamson* v. *Lee Optical of Okla.* (1955) 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563], in which it was noted that debatable issues as respects business, economic and social affairs were for legislative decision.[6] (Also see *United States* v. *Carolene Products Co.* (1938) 304

---

[5] "Few legal doctrines have been subjected to more bitter criticism than this testing of regulatory legislation by the due process clause," Professor Monrad Paulsen wrote in *The Persistence of Substantive Due Process in the States* (1950) 34 Minn. L. Rev. 91. He concluded that the invalidation by reason of the due process clause of state laws seems "to be a matter of history."

[6] Mr. Justice Douglas opened his opinion in *Williamson* v. *Lee Optical of Okla.* (1955) 348 U.S. 483, 488 [75 S.Ct. 461, 99 L.Ed. 563], with these words: "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."

U.S. 144, 154 [58 S.Ct. 778, 82 L.Ed. 1234] ;[7] Carpenter, *Economic Due Process and the State Courts* (1959) 45 A.B.A.J. 1027.)

The result of this virtual abdication of the economic field by the judiciary has been, noted Justice Holmes in *Tyson & Brother-United Theatre Ticket Offices, Inc.* v. *Banton* (1927) 273 U.S. 418, 446 [47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236] [dissenting opinion], "that, subject to compensation when compensation is due, the legislature may forbid or restrict any business when it has a sufficient force of public opinion behind it." This, concludes Professor McCloskey in his article in The Supreme Court Review, *supra,* page 41, "is the *de facto* policy of the modern Court." In the case at hand, we have a rare instance in which the force of public opinion is precisely and numerically demonstrable.

Mr. Chief Justice (then Justice) Traynor, in his dissent in *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 449-450 [254 P.2d 29], discussed legislative power in the broad field of economics in this manner: "The Legislature has power to determine the rights of persons, subject only to the limitations of the United States Constitution and the California Constitution. [Citations.] A statute regulating commercial transactions does not violate the due process clause of either Constitution unless it is proved so unreasonable as to dispel the presumption that it rests upon some rational basis within the knowledge and experience of the legislators. [Citations.] Judicial inquiry 'where the legislative judgment is drawn into question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it.' [Citation.] The statute in the present case, like any other regulation of private enterprise, must be considered in this light." Justice Traynor then discussed progression from early decisions holding regulation limited to industries "clothed with a public interest (see *Ribnik* v. *McBride,* 277 U.S. 350 [48 S.Ct. 454, 72 L.Ed. 913]) [and found] the United States Supreme Court discarded that test in *Nebbia* v. *New York,* 291 U.S. 502, 531-539 [54 S.Ct. 505, 78 L.Ed.

[7]Chief Justice Stone wrote in *Carolene* (at p. 154) that "Regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."

For a discussion of Stone's controversial footnote 4 in *Carolene,* see Mason, Harlan Fisk Stone (1956), pp. 511-515.

940]. (See also *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 [57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330].) In *Olsen* v. *Nebraska,* 313 U.S. 236, 244 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500], the court in a unanimous opinion over-ruled the *Ribnik* case and refused to inquire into the wisdom of the challenged legislation. . . . This court soon followed the lead of the United States Supreme Court. (*Wholesale Tobacco Dealers Bureau* v. *National Candy & Tobacco Co., supra,* 11 Cal.2d 634, 655 [82 P.2d 3, 118 A.L.R. 486].)'' (On this phase of economic regulation, see Notes in (1954) 39 Cornell L. Q. 561, 578-579; (1953) 2 Jour. Pub. Law 98; (1952) 37 Iowa L. Rev. 196.)

In a long series of cases involving state legislative incursions into economic liberty, the Supreme Court has evolved a formula that the due process clause prohibits state restrictions on individual freedom only if they are capricious, arbitrary and without foundation in reason. As will be seen hereinafter, I do not believe the restrictions here are of that character. To promote public health, safety, morals and welfare, the state must have power to impose restrictions on the activities of individuals which reasonably relate to these legitimate objectives of legislation. It must have a reasonable latitude for action to cure or mitigate social and economic evils. And it is clear that if the court finds that the legislative judgment is within the area in which reasonable men might differ, the law is to be upheld. (Harper, Justice Rutledge and the Bright Constellation (1965) pp. 97-98.)

Having previously applied the ''balancing test'' to ascertain if freedom of speech was invalidly hampered and having reached a negative conclusion, we now approach a second phase of balancing to determine whether the economic regulation is reasonable and thus justifies whatever incidental intrusion upon the rights of these plaintiffs may ensue.

Taking all the factors of balancing into account, it is clear that maintaining a system of freedom of expression is one of the most complex problems any society has to face. Self-restraint, self-discipline and maturity are required. The theory is essentially highly sophisticated. Members of the society must be willing on occasions to sacrifice individual and short-term advantage for social and long-range goals. And the process necessarily operates in a context that is charged with emotion and subject to powerful conflicting forces of self-interest. (Emerson, *Toward a General Theory of the First Amendment* (1963) 72 Yale L. J. 877, 889.)

Adjustment of rights is a meaningful concept. For it must be apparent that the attainment of freedom of expression is not the sole aim of society. Professor Emerson has written that "as the private right of the individual, freedom of expression is an end in itself, but it is not the only end of man as an individual. In its social and political aspects, freedom of expression is primarily a process or a method for reaching other goals. It is a basic element in the democratic way of life, and as a vital process it shapes and determines the ends of democratic society. But it is not through this process alone that a democratic society will attain its ultimate ends. Any theory of freedom of expression must therefore take into account other values, such as public order, justice, equality and moral progress, and the need for substantive measures designed to promote those ideals. Hence there is a real problem of reconciling freedom of expression with the other values and objectives sought by the good society." (72 Yale L. J., *supra,* at p. 907.)

Chief Justice Stone once wrote: "There must be reasonable accommodation between the competing demands of freedom of speech and religion on the one hand, and other interests of society which have some claims upon legislative protection. To maintain the balance between them is essential to the well-ordered functioning of government under a constitution. Neither is absolute, and neither can constitutionally be made the implement for the destruction of the other." (Letter to Justice Rutledge, Jan. 23, 1944, quoted in Mason, Harlan Fiske Stone (1956) p. 535.)

Freedom of speech is not a portmanteau phrase, a contraction of expression and action. Therefore, in attempting to formulate a workable legal doctrine which will take into account the basic factors underlying our system of freedom of expression and which will give effect to the fundamental decision embodied in the First Amendment for reconciling freedom of expression with other social values and objectives, we must distinguish between "expression" and "action." (Emerson, *Toward a General Theory of the First Amendment* (1963) 72 Yale L. J. 877 et seq.) The line in many situations is clear, but in some contexts it becomes obscure. Nevertheless, finding the line becomes necessary, for all available authorities hold that while expression must be given protection, action is subject to regulation. In borderline cases "the determination of whether the conduct is to be treated as expression or action rests upon whether the harm is immedi-

ate, whether it is irremediable, and whether regulation of the conduct is administratively consistent with maintaining a system of freedom of expression.'' (*Id.* at p. 917, fn. 47.)

What we have here is regulation of action, the act of televising to homes and charging monetary consideration therefor; we do not have an inhibition of expression, its mode or content. Thus the Act meets Emerson's test of being administratively consistent with maintaining a system of freedom of expression.

Justice Jackson's concurring opinion in *Thomas* v. *Collins* (1945) 323 U.S. 516, 545 [65 S.Ct. 315, 89 L.Ed. 430], makes a significant contribution to understanding the distinction between freedom of speech and communication for hire. The ''wider range of power over pursuit of a calling than over speech-making,'' he wrote, after giving a number of illustrations, ''is due to the different effects which the two have on interests which the State is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money.'' To the same effect, see the rule discussed in *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 305 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352], that the ''general regulation, in the public interest, of solicitation . . . is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.'' See also *Prince* v. *Massachusetts* (1944) 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645], in which a prohibition against street solicitation by children was held not to be an unconstitutional interference with freedom of religion. To the same effect is *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232 [163 P.2d 704].

*Breard* v. *Alexandria* (1951) *supra,* 341 U.S. 622, 644, presents a factual situation not dissimilar to the instant case. Breard had a crew of courteous solicitors who sought to sell magazines from door to door contrary to a local prohibitory ordinance. The constitutionality turned upon ''a balancing of the conveniences between some householders' desire for privacy and the publisher's right to distribute publications in the precise way that those soliciting for him think brings the best results.'' After weighing the conflict the court concluded (at p. 645) that it would be ''a misuse of the great guarantees of free speech and free press to use those guaran-

tees to force a community to admit the solicitors of publications to the home premises of its residents.'' It would appear to be no less a misuse of free speech to compel the State of California, contrary to the expressed desire of a majority of its citizens, to admit television for hire into homes. It is no answer to say those who do not desire pay television may refuse it; the people of Alexandria were not compelled to see solicitors or to subscribe to Breard's magazines. As the court there held (at p. 642), ''The First and Fourteenth Amendments have never been treated as absolutes. Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life.'' The key in *Breard* was, as it is in the instant case, the commercial aspect of the communications.

Remarkably apposite to our problem is *Valentine* v. *Chrestensen* (1941) 316 U.S. 52 [62 S.Ct. 920, 86 L.Ed. 1262]. A municipal ordinance forbade distribution in the streets or other public places of handbills containing commercial matter. The alleged offender circulated handbills with personal polemics on one side and a commercial message on verso. The ordinance was upheld, and Justice Roberts, for a unanimous court, made the distinction between valid and impermissible prohibition crystal clear (at p. 54): ''This court has unequivocally held that the streets are proper places for the exercise of the freedom of communicating information and disseminating opinion and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or proscribe its employment in these public thoroughfares. *We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising.* Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment.'' (Italics added.) There is no rational explanation for the ability of society to prohibit commercialism in the streets but to be impotent when it desires to control commercial invasion of homes.

It may well be that the Act in question here is, in the words of Justice Stewart in *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 527 [85 S.Ct. 1678, 14 L.Ed.2d 510] [dissenting opinion], ''an uncommonly silly law.'' But the role of the judiciary is not to substitute its view of propriety for that of

the legislative process, as long as the court finds no constitutional inhibition violated. Justice Black, also in *Griswold*, expressed his frequent doubt that the court should "sit as a supervisory agency over acts of duly constituted legislative bodies and set aside their laws because of the Court's belief that the legislative policies adopted are unreasonable, unwise, arbitrary, capricious or irrational. The adoption of such a loose, flexible, uncontrolled standard for holding laws unconstitutional, if ever it is finally achieved, will amount to a great unconstitutional shift of power to the courts which I believe and am constrained to say will be bad for the courts and worse for the country." (At p. 521.)

We must not be oblivious to the admonition of Justice Frankfurter in *Dennis* v. *United States* (1951) *supra,* 341 U.S. 494, 539-540 [concurring opinion], that "direct policy-making is not our province. How best to reconcile competing interests is the business of legislatures, and the balance they strike is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment." And again, in *Dennis,* he said, "We are to set aside the judgment of those whose duty it is to legislate only if there is no reasonable basis for it."

In our process of balancing competitive economic interests, we now reach the question whether "there is no reasonable basis" for this Act and it is "outside the pale of fair judgment" and whether the plaintiffs who challenge the statute's validity have in their pleadings—since no testimony was taken and the matter was decided on the pleadings—shown that it is "palpably arbitrary and beyond rational doubt erroneous." (*State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 365, 371 [310 P.2d 7].)

Contentions of the defendant and amici curiae may be reduced to the following syllogism:

a. the free television industry bears a demonstrable relationship to public welfare, convenience, morals, health and economy, and therefore should be protected by government in the public interest;

b. pay television threatens impairment of the benefits of free television presently enjoyed by the public;

c. to preserve the asset of free television, the public through its legislative process may take such steps as are necessary to thwart impairment by pay television.

The major or minor premise of the syllogism may be weak or debatable, but this would hardly be unprecedented in the

legislative arena. A disputatious posture does not justify finding as a matter of law that the logic is captious or the conclusions capricious or arbitrary.[8] Indeed, the foregoing theme, in one form or another, was advanced both in congressional and legislative hearings and in the persuasive argument made to the voters at the time this Act was adopted. Whether the contentions are wholly sound or factual, if there be a reasonable legislative belief in their support, under the balancing test the state's police power unquestionably permits prohibition of an activity or business that may reasonably be thought to threaten destruction or impairment of some other activity or business deemed by the state's legislative power to be important to the public welfare, health, morals, economy, or convenience. (*Miller* v. *Schoene* (1928) 276 U.S. 272, 279 [48 S.Ct. 246, 72 L.Ed. 568].)[9]

The foregoing, as a desired end, is perfectly proper. It might be said that other and less drastic means could be found to accomplish the purpose of protecting free television and avoiding commercial exploitation in the home, that the Act here results in throwing out the baby with the bath water. Perhaps other devices could be suggested and other alternatives adopted. But in the area of economic regulation, if the ends are valid, and the means are related to the ends, the legislative process may select from among the appropriate means. The enactment in question represents the selectivity of the people of the state in the exercise of their legislative power. It is not the judicial function to second-guess the legislative choice of alternatives.

Justice Holmes put it this way in *Lochner* v. *New York* (1905) 198 U.S. 45, 75-76 [25 S.Ct. 539, 49 L.Ed. 937] [dissenting opinion]: "Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation to the citizen to the state, or of *laissez faire*. It is

---

[8]See Chafee, Free Speech in the United States (1942) p. 406, in which the author discusses at some length the bases for immunizing the home from commercial intrusion. He found a new right which he labeled "freedom of the home."

[9]The *Miller* case bears a striking analogy to the instant case. Apple growing was one of the principal agricultural pursuits in West Virginia. The red cedar was indigenous to the state and was the subject of a small lumber industry. The trees, however, harbored a parasite that was harmful to apple trees. A statute that required all red cedar trees in the state to be destroyed, thus clearly favoring one industry over another, was held constitutional.

made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.''

Perhaps the most appropriate peroration is found in the words of Chief Justice Traynor in his dissent in *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra,* at page 458 of 40 Cal.2d: ''The real basis for the result reached by the majority opinion is an adherence to an economic view that [the regulatory] legislation is not in the best interests of the general public. But as Mr. Justice Holmes long admonished, the economic and moral beliefs of the judiciary are not embedded in the Constitution. There is no reason to suppose that judges are better qualified than legislators to determine what social and economic programs should be adopted by the State of California.'' In this instance, substitute for ''legislators,'' the words ''the sovereign people.''

I would reverse the judgment.