COMMUNITY COMMUNICATIONS
COMPANY, INC.,
Plaintiff-Appellee,

v.

CITY OF BOULDER, COLORADO et al.,
Defendants-Appellants.

No. 80–1348.

United States Court of Appeals,
Tenth Circuit.

May 28, 1980.

Rehearing Denied Oct. 1, 1980.

Jeffrey H. Howard of Davis, Graham & Stubbs, Denver, Colo. (Dale R. Harris and Bruce T. Reese of Davis, Graham & Stubbs, Denver, Colo., with him on the brief; Joseph N. de Raismes and Alan E. Boles, Jr., Boulder, Colo., of counsel), for defendant-appellant.

Harold R. Farrow of Farrow, Schildhause & Wilson, Oakland, Cal. (Thomas A. Seaton of Farrow, Schildhause & Wilson, Oakland, Cal., Stephen M. Brett, Robert E. Youle, and Craig R. Maginness of Dawson, Nagle, Sherman & Howard, Denver, Colo., with him on the brief), for plaintiff-appellee.

Thomas P. McMahon, Asst. Atty. Gen., Antitrust Section, State of Colorado, Denver, Colo. (J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., B. Lawrence Theis, First Asst. Atty. Gen., Antitrust Section, Denver, Colo., with him on the brief), for amicus Colorado Atty. Gen.

Jane E. Roberts, Wheat Ridge, Colo., filed a brief on behalf of amicus Colorado Municipal League.

Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and MARKEY, Judge *.

SETH, Chief Judge.

The plaintiff, who holds a non-exclusive franchise from the City of Boulder to engage in the cable television business in the City, brought this action against the City and another cable TV business entity. Some eleven causes of action are asserted. The complaint is directed to a City ordinance which placed a moratorium on expansion by the plaintiff in the City and to the action by the City in soliciting other cable TV business to engage in business under a proposed model ordinance. One of the causes of action asserted an antitrust violation, and this was the concern of the trial judge.

The plaintiff sought a temporary restraining order against the City to prevent its restrictions on expansion. The trial court granted the order on the basis of the antitrust allegations. The defendant City has taken this appeal from the order.

Before this court the central issue is whether the City is exempt from the antitrust laws.

There were two principal actions taken by the City which were considered by the trial court without really differentiating between them. One was the 90-day moratorium on expansion by the plaintiff, and the second was the model ordinance for cable television in Boulder with the solicitation of new businesses to enter the market under the proposed ordinance. The 90-day moratorium was imposed by the City by a general ordinance and by the enactment of an ordinance directed specifically to the non-exclusive franchise of plaintiff. The restraining order issued was in general terms and was directed to any unilateral action by the City to restrict or revoke the authority of plaintiff to "conduct" its business in Boulder.

The trial court combined the two elements in the following summary of what the court considered Boulder to have done:

"Most simply stated, Boulder has attempted to restrict the lawful business of CCC by preventing it from obtaining new customers for three months while potential competitors submit proposals for serving those same customers. The motivation may be to foster competition in the long run, but the direct and immediate effect is a restraint of trade and an artificial and unreasonable geographical market allocation."

The three-month period expired one day following the entry of the restraining order so we must assume that the trial court was considering the model ordinance as a substantial and continuing factor.

Of the model ordinance and the solicitation, the court was critical of the method or the way the matter was handled. The objection thus appears to be to the way it was done and not what was done. The following quotation from the trial court's order demonstrates this aspect of the ruling and also shows how the trial court disposed of the *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, contentions. The court of this said:

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

"Assuming that Boulder does have the claimed authority to regulate cable television within the City in the manner which would be required to impose all of the terms and conditions in the draft ordinance which was submitted to the plaintiff and other cable companies, the approach taken is not an appropriate exercise and articulation of a policy of regulation. It is not characteristic of utility regulation for the regulating authority to negotiate with those to be regulated and then formulate the final policy by exercising legislative power through an offer and acceptance mechanism. It might well be a different case if Boulder had enacted an ordinance articulating qualifying criteria for cable companies to do business in the City, with such other regulations as the City government might believe to be necessary and proper in the exercise of police power, and then to confront the contention that such an ordinance has an anticompetitive effect. That is not this case. Here, upon the present record, *Parker v. Brown* is wholly inapplicable and Boulder is subject to antitrust liability under *City of Lafayette v. Louisiana Power & Light* [435 U.S. 989, 98 S.Ct. 1123, 55 L.Ed.2d 364], *supra* for the actions which it has taken."

We cannot agree that the method followed by the City somehow eliminated the *Parker v. Brown* considerations. We also cannot agree that the model ordinance with the solicitation and negotiations was somehow improper or beyond the authority of the City. This would not seem to be an issue in the case. The very same method apparently was followed by Vail in the *Manor Vail* case hereinafter considered, and the Colorado Supreme Court found nothing to comment on. In *Manor Vail Condominium Ass'n v. Town of Vail*, 604 P.2d 1168 (Colo.), the Supreme Court of Colorado considered a rather broad challenge to an ordinance of the Town of Vail regulating cable television. A franchise had there been granted to a subsidiary of the plaintiff in this action. The ordinance also fixed rates under Colorado "home rule" authority. The company there sought to support the ordinance as a proper function of the town. The challenge basically was to categories established for rate making under the Constitution. The Colorado Supreme Court upheld the rate making as a valid exercise of regulatory authority. The court treated the issues as it would any regulatory authority exercised by the State of Colorado. Thus strict scrutiny compared to "legitimate state interest," was applied. The court also refers to the wide latitude to be afforded local governments in the exercise of police powers. The treatment of the rate issue in the *Manor Vail* case is significant to our problems here. The state court did not expressly discuss home rule, but assumed that the Town of Vail had full authority to regulate rates. The issue treated was how the regulation was carried out.

It is a mistake to generalize about "home rule" as it may be treated in opinions from different jurisdictions. We are concerned only with Colorado home rule under article XX, section 6, of the Colorado Constitution. The pertinent part reads:

"Section 6. Home rule for cities and towns. The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the state of Colorado or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.

"Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

. . . . .

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not

be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

The trial court said during the hearing as to authority for the City of Boulder:

"THE COURT: If you get down to the ultimate source of the power, and governmental concepts, Boulder is exercising authority of the people of the state of Colorado in matters of local concern within Boulder, because the people of the state of Colorado exercising their ultimate sovereign power put Article 20 in the Constitution of this state. They are not operating under some delegated authority from the representatives in the general assembly. They are operating on the basis of the ultimate sovereign authority of the people of the state. That's what Colorado's Article 20 is all about."

The source of the authority of the City here is thus derived directly from the state constitution and is not a residual or delegated power. *See* the references in *City and County of Denver v. Henry*, 95 Colo. 582, 38 P.2d 895, to the situations where an ordinance may even supersede a state statute as to matters of purely local concern. *See also Service Oil Co. v. Rhodus*, 179 Colo. 335, 500 P.2d 807, and *Davis v. City and County of Denver*, 140 Colo. 30, 342 P.2d 674. In any event, we are here concerned with City action in the absence of any regulation whatever by the State of Colorado. Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City.

The Colorado Supreme Court has considered the scope of the Colorado version of home rule in several other cases including *Veterans of For. Wars, Etc. v. Steamboat Springs*, 575 P.2d 835 (Colo.), *Security Life and Accident Co. v. Temple*, 177 Colo. 14,

492 P.2d 63, and *Four-County Met. C.I. Dist. v. Board of County Com'rs.*, 149 Colo. 284, 369 P.2d 67. In the *Four-County Metro* case the court stated that the home rule cities in Colorado as to local matters had the complete authority.

The franchise of the plaintiff cable TV company is necessarily limited to service within the City of Boulder. The services provided are limited to City residents through the use of City streets and ways. The matter or subject is a local one. The Colorado court in the *Manor Vail* opinion assumed that the rate regulation of cable TV was a matter of local concern in the home rule context. *See also People v. Mountain States Tel. & Tel. Co.*, 125 Colo. 167, 243 P.2d 397. The Supreme Court in *TV Pix, Inc. v. Taylor*, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746, affirmed a three-judge court decision (304 F.Supp. 459, D.Nev.) holding that the regulation of the community antenna system was a local business and did not constitute an interference with interstate commerce. The facts before us represent a comparable situation.

It would not seem useful under these circumstances to explore the differences between control by contract or by police power. The City is not in the television business in any way, and whether by contract or police power the action is an exercise of governmental authority. There is no element of proprietary interest of the City.

■ We must hold that under the Colorado Constitution and under the *Manor Vail* decision that the regulation of the business of cable TV is well within the power and authority of the City of Boulder. Further, under the circumstances the regulation here concerned was the only control or active supervision exercised by state or local government, and it represented the only expression of policy as to the subject matter.

The record contains a number of transcripts of City Council meetings. The discussions were extensive and the purpose of the moratorium and the model ordinance was made clear. There are also statements of purpose accompanying the ordinances.

The City adopted a policy of fostering competition to receive a franchise for cable TV within the City, again a non-exclusive franchise. The moratorium was to permit these applications under circumstances where there remained a substantial number of customers not yet connected to the cable of the plaintiff. This appears to be a very clear statement of policy on the public record. Whoever obtained the franchise or the additional franchise would be required to operate under the model ordinance. The ordinance had been formulated after hearings, discussions and negotiations. The City had a consultant to give advice on the matter.

■ We cannot agree with the trial court that the City is not exempt from antitrust liability under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. In *Parker* suit was brought to enjoin enforcement of a California state agricultural proration program which restricted competition among growers and maintained prices. The Supreme Court found that the restraints of the plan were imposed as an act of government, and that such "state action" is not prohibited by the Sherman Act.

The trial court here apparently concluded that *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364, was controlling. However, in *Lafayette* the City was authorized to own and operate its electric utility. Louisiana Power & Light was sued by the City for antitrust violations, and the utility counterclaimed under the Sherman Act for alleged anticompetitive activities. A divided Supreme Court ruled that the City was not immune from antitrust liability. The decision, considering the several opinions, was grounded on the fact that the action was not directed or authorized by the state "pursuant to state policy to displace competition with regulation or monopoly public service." 435 U.S. at 413, 98 S.Ct. at 1137.

*City of Lafayette* must be distinguished from the case before us because, as discussed above, no proprietary interest of the City is here involved. In any event, the statement of policy requirement in *Lafa-*

*yette* has been met as indicated in the home rule discussion herein.

The Supreme Court holding in *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), supports an application of the *Parker* exemption in these circumstances. The Court in *California Retail* set out two standards for governmental antitrust immunity: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as State policy'; second, the policy must be 'actively supervised' by the State itself." (445 U.S. at 105, 100 S.Ct. at 943, *citing City of Lafayette, supra.*) This latest test for the *Parker* exemption has been met by the City of Boulder. The policy was affirmatively expressed through the language of the ordinances. The second part of the *California Retail* test was met by the active supervision and enforcement of the policy by imposition of the 90-day moratorium on construction and by issuance of civil and then criminal citations to cable workers when the moratorium was ignored.

We conclude that *City of Lafayette* is not applicable to a situation wherein the governmental entity is asserting a governmental rather than proprietary interest, and that instead the *Parker-Midcal* doctrine is applicable to exempt the City from antitrust liability.

We must thus conclude that the trial court was in error as a matter of law as to the basis for issuance of the temporary restraining order. There is expressed no other basis for the restraining order than the antitrust factor.

In these circumstances we do not apply the usual standards outlined in *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181 (10th Cir.); *Securities & Exchange Commission v. Pearson*, 426 F.2d 1339 (10th Cir.), and the typical cases.

■ A temporary restraining order must be set aside although there may be no abuse of discretion as to the balance of equities or as to the matter of irreparable injury if the trial court has based its action to a substan-

tial extent upon a determination of law which the appellate court considers to be in error. Of this doctrine the District of Columbia Circuit in *Northeast Construction Co. v. Romney*, 485 F.2d 752 (D.C.Cir.) said after referring to the broad discretion of the trial court as to the equities, irreparable injury, and related factors:

> "But a preliminary injunction must be reversed even where *no abuse of discretion exists* as to such matters, when the trial court has proceeded upon a premise as to the rule of law which the appellate court deems erroneous. We conclude that underlying the District Court's conclusion of law, that plaintiff is likely to succeed on the merits, is an erroneous legal premise that requires reversal."

*See also United States v. School Dist. of Ferndale*, 577 F.2d 1339 (6th Cir.); *Hamilton v. Butz*, 520 F.2d 709 (9th Cir.); *Grubbs v. Butz*, 514 F.2d 1323 (D.C.Cir.); *Society for Animal Rights, Inc. v. Schlesinger*, 512 F.2d 915 (D.C.Cir.); and *Pullum v. Greene*, 396 F.2d 251 (5th Cir.).

Thus we must reverse the judgment and order of the trial court and remand the case. We also terminate our order entered in this action on May 9, 1980 which was directed to the plaintiff.

MARKEY, Chief Judge, dissenting.

With the greatest respect, I dissent. Though these remarks will not affect the course of Western Civilization, they are compelled by a conviction that the judgment below was eminently sound and unequivocally correct. Because, as set forth in its Memorandum Opinion and Order, the trial court committed *no abuse of discretion*, and because its judgment order is fully supportable on at least First Amendment grounds, I would affirm.

### The Facts

In 1964, Boulder entered a 20-year, non-exclusive license-contract with a predecessor of plaintiff Community Communications Company (CCC), under which CCC was licensed to string cable throughout the city and to supply cable television (CATV) communications, that is, news, information, and entertainment, to Boulder's citizens. The contract is cancellable at will by the city. CCC has indisputably and at all times complied with that contract.

In 1973 and 1974, the city unsuccessfully sought bids for a cable operator to serve the entire city, to buy out CCC, and to submit to extensive regulation by the city.

In July of 1979, "Boulder Communications Company" (BCC), wrote the city, saying it had been formed by six citizens of Boulder, tendering a resolution under which it would receive a permit to build its system, stating that it would if permitted build its system, "whatever action the city takes in regard to [CCC]," stating its plan for stockholders of BCC to be Boulder citizens, and promising to supply Boulder with "the best that cable has to offer."

The city, though at all times fully free to do so, declined and still declines to grant BCC, or any other company, a non-exclusive license to compete with CCC in the cable market in Boulder. Though advised by its consultant that modern technology made open and free cable competition feasible, the city persisted in its position that only one cable operator could serve Boulder.

CCC's announcements of expenditures for expansion in Boulder were warmly applauded by the city's officials in May of 1979.

However, in the summer of 1979, the city re-launched its 1973–74 effort to find and install a cable operator which would serve the entire city and which would submit to broad control of its business by city officials.

The city decided that open competition would not produce the "best" cable TV operator, that it and not Boulder's cable consumers would decide which was "best," that there could be only one, and that the one must adhere to rigid controls by the city.

The city's Attorney advised that it lacked authority to impose those controls by regulations, but could do so using a bid-contract process in which the chosen company would agree to those controls.

The city drafted a "model ordinance" (contract) of twenty-two pages, to be entered by the one successful bidder, and giving the city pervasive controls of the selected cable operator's business, including its programming. Among the salient features of the model contract are:

The city's right to purchase the cable company, at a price excluding good-will and limited to depreciated investment; the city's right of prior approval of every company contract; rate regulation; the city's right to change rates at any time; a 5% franchise fee (two and one-half times the present fee); a requirement for five leased access channels; a complaint procedure monitored by the city manager, with a liquidated damage provision; a requirement to upgrade company facilities continually to state-of-the-art conditions; and a requirement for renegotiation, at specified intervals, of rate structures, free or discounted service, services provided, *programming offered*, and human rights.

In November, 1979, BCC again wrote the city, saying it was best qualified to serve Boulder, claiming support from citizen groups, stating a preference for an immediate permit under the city's "new policy ordinance." BCC accepted the "request for bid" situation, but warned that requesting bids would not solve legal "problems of an anti-trust nature." BCC said the bid procedure would require that CCC's license be revoked, or that CCC agree not to expand (saying economics precluded more than one cable operator). Again denying the necessity for bids, BCC repeated its earlier offer to submit to the city's controls, and suggested that the city revoke CCC's license, offering in that event to purchase CCC's system. BCC closed with assurance that "there is no question that we are best suited to bring cable services to Boulder."

In December, 1979, fearing possible frustration of its plans, the city enacted ordinance 4473, imposing a 90-day moratorium on CCC's expansion, and ordinance 4472, repealing and reenacting CCC's license contract, with a section making CCC's continued operation in its existing area an "acceptance" of the 90-day moratorium and of the geographic restriction.

When CCC continued building, city authorities arrested its construction crews and tore down its cables.[1]

The city sought an injunction against CCC's expansion. An injunction was denied by Judge Neighbors, of the Boulder District Court. *City of Boulder v. Community Communications Company, Inc.*, No. 80–CV–0198. Noting that the federal court had assumed jurisdiction, Judge Neighbors added that he was not convinced the city would prevail on the merits, that the equities did not favor the city and that significant First Amendment issues were present.

In the present case, the district court issued this Order:

ORDERED, that so long as the plaintiff, Community Communications Company, Inc., operates within the terms and conditions of Ordinance No. 2846, enacted October 6, 1964, [the original contract] the city of Boulder and all of its officers, agents, servants, employees, and attorneys are enjoined from taking any unilateral action to restrict, limit, or revoke the authority of the plaintiff to conduct its cable television business in the City of Boulder.

### The First Amendment

The judgment below will be affirmed on appeal if any basis for affirmance, whether

---

1. It is not necessary to question the sincerity of the city's officials, acting in the belief that they were better able than Boulder's cable consumers to determine which cable operator was the "best" for Boulder's citizens. The refusal to permit individual consumers to decide among competitors in open competition has here spawned delay in service to new consumers, arrests, equipment tear-down, two law suits, an appeal, continuing litigation, and the concomi- tant expense to all local and federal taxpayers. That harm may be caused by the sincere who would do good is but a price to be paid, lest no good be ever done. In this particular case, however, the circumstances tend to confirm the wisdom animating the Sherman Act, its national policy insistence on open, free competition, and its prohibition against unnecessary interference therewith.

or not relied on below, appears in the record. *Carpenters District Council v. Brady Corp.*, 513 F.2d 1, 4 (10th Cir. 1975); *see SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Casto v. Arkansas-Louisiana Gas Co.*, 597 F.2d 1323, 1325 (10th Cir. 1979); *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1124 (10th Cir. 1979); *Fleming Building Co. v. Northeastern Oklahoma Building and Construction Trades Council*, 532 F.2d 162, 166 (10th Cir. 1976).

In my view, just such a basis for affirmance, compelling in its force and thrust, lies in the city's violation of the rights of speech and press guaranteed to CCC, and to the citizens of Colorado and of the United States who reside in Boulder, by the First Amendment.[2]

Though both the state and federal trial judges expressed concern over violation of First Amendment rights here, the former disposed of the city's requested injunction primarily on jurisdictional grounds and the latter granted CCC's requested injunction primarily on Sherman Act considerations.

That CATV is engaged in interstate commerce is clear. *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168–169, 88 S.Ct. 1994, 2000–01, 20 L.Ed.2d 1001 (1968). That Boulder's reach for massive control of the CATV market within its borders is an interference with that commerce is to me equally clear. But, as recognized by the federal trial court, another "wider concern" is that for the First Amendment.[3]

Looking at the proposed model contract ordinance as the source of First Amendment concerns, and noting that the city had not yet engineered an acceptance of that contract, the trial court deemed its effect merely prospective and contented himself with a warning.[4] In my view, as injurious

---

2. Affirmance on First Amendment grounds avoids the constitutionality-risking interpretation of the Colorado constitution's "home rule" provisions found necessary by the majority to support absolute immunity of Colorado cities from the Sherman Act. Further, affirmance on First Amendment grounds avoids the concern expressed by Mr. Justice Blackmun in *City of Lafayette* for the effect on municipalities and their citizens of the Sherman Act's treble damage provisions.

   The Colorado Attorney General's brief for *Amicus* State of Colorado, concentrating on Sherman Act considerations, "assumed *arguendo* that the first amendment may limit, but does not wholly prohibit" Boulder's authority.

3. Cable TV is a First Amendment speaker. See *Midwest Video Corp. v. FCC*, 571 F.2d 1025 (8th Cir. 1978) (*aff'd on other grounds sub nom. FCC v. Midwest Video*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 46 (D.C.Cir. 1977) *cert. den.* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Greater Fremont, Inc. v. City of Fremont*, 302 F.Supp. 652 (N.D.Ohio 1968) *aff'd sub nom. Wonderland Ventures, Inc. v. City of Sandusky*, 423 F.2d 548 (6th Cir. 1970); *Weaver v. Jordan*, 64 Cal.2d 235, 49 Cal.Rptr. 537, 411 P.2d 289 (1966); and *Television Transmission, Inc. v. Public Utilities Commission*, 47 Cal.2d 82, 301 P.2d 862, 865 (1956).

4. Concerning the First Amendment, the trial judge said:

   Obviously there are wider concerns, including interstate commerce, giving rise to some uncertainty about the power of the state government in this regard, both in terms of an obstruction to interstate commerce, and with respect to the First Amendment rights of communicators.

   .    .    .    .    .

   There are two other aspects of this case which are deserving of preliminary observations at this time. The plaintiff has attempted to use the shield of the First Amendment to avoid any interference from City government. That is an obvious overstatement of the law and an attempt to escape the reality that the messages it chooses to transmit must pass through a medium which is subject to some control by the City.

   While the defendant Boulder readily concedes that the First Amendment would prohibit its control of the content of these transmissions, it does assert both the right and the responsibility for restricting the use of the public ways in this communications system. The question, of course, is what are the limits of that authority? If controlling content of the programs is beyond those limits, is it different, either in degree or in kind, for the City government to prescribe the number, variety, and scope of programming and services to be offered? And, is it appropriate for the City administration to say that the acceptability of a cable company rests on its willingness to contribute free services to that

to First Amendment freedoms as the model would be, the 90-day moratorium was itself an impermissible prior restraint on the right to speak and hear.

In effect, by its "ordinances" 4473 and 4472, the city has said to CCC, "Thou shall not speak your truth to any Boulder citizens residing outside your present area of operation for 90 days." To Boulder citizens in those areas, the city has said, "Thou shall not for 90 days hear CCC's speech." [5] It is difficult to imagine a more flagrant and chilling inroad on cherished First Amendment freedoms.

It is further difficult to visualize a valid defense to a charge in this case of violating CCC's First Amendment rights, and those of Boulder's citizens outside CCC's present operating area. Absence of concentration on the issue below would appear of little or no moment here, where there is no issue of material fact, and all relevant facts are of record. Before the moratorium, CCC had the right to speak outside its area. During the moratorium it did not.[6] When it tried to speak, it was arrested and its cables were torn down.

There is no police-power suggestion of concern for the public safety and welfare in CCC's use of Boulder's rights-of-way. Nor could there be, that factor being handled by the public utility, with whom CCC contracts for poles on which to string its cables.

On appeal, the city's sole defense is to pretend, disingeniously and contrary to the extensive, uncontradicted testimony and the specific findings of the trial judge, and contrary to its own City Attorney's advice, that cable is a "natural monopoly." The city's sole argument in this case is that because there can be only one cable operator in Boulder,[7] the moratorium was necessary to prevent CCC from "wiring the entire city" before the city could conduct its bid process and select what it considered the "best" company to enjoy that monopoly. Not to put too fine a point on it, that argument is today simply fallacious. As the trial judge found, and as the record makes clear, modern technology makes free and open competition both practically and economically available to the city by at least four competing cable communicators.[8]

government or to such institutions or groups as may be considered to be in need of benefit or reward? Stated bluntly, may the City exact tribute for its favor?

While these questions are not now ripe for decision, they are potential problems in this developing situation. It is inappropriate to ascribe any illegal or improper intent to action which has not yet been taken, but it may be helpful to give caution about the potential consequences of that which may be contemplated. The City should carefully consider the need to exercise its authority by narrowly drawn regulations which do not unnecessarily interfere with First Amendment freedoms, as the Supreme Court has cautioned in *Village of Schaumburg v. Citizens for a Better Environment*, 441 U.S. 922, 99 S.Ct. 2029, 60 L.Ed.2d 395.

5. The trial court referred to "interested persons who are not before the court."

6. Nor is CCC likely, under the city's plan, ever to speak again outside its present area. The city, after receiving the majority opinion, signaled its intent to impose a second moratorium. In its briefs here it repeated, ad nauseam, that its 90-day moratorium was merely "a one-time, temporary" delay in CCC's expansion. The city refused, however, to assure Judge Matsch that it would not impose second and continuing

moratoriums if he denied the injunction. The city appealed the injunction interlocutorily, and moved to expedite, even though the moratorium expired the day after the injunction issued. Moreover, a failure to impose continuous moratoriums might, as the city elsewhere argues, allow CCC to "wire the entire city" and thus defeat the city's plan to grant either one monopoly for the entire city, or a number of monopolies, each in a specified district. Hence, the city must either abandon its present plan or it must continue to impose moratoriums on CCC's right to speak outside its present area.

7. The city says it considered, and may still consider, "districting," i. e., parceling out areas of the city to different cable operators. The effect on the First Amendment, however, is the same, for the city would be restraining each operator from speaking outside his assigned area, and would be dictating each consumer's choice, limiting it to the one cable operator chosen by the city to speak to that consumer.

8. The trial court said:
    Under the present technology, more than one cable company can be on the same poles without adversely affecting the public ways. While there certainly are finite limits to overbuilding, those limits are something beyond two companies.

Though the city may have difficulty getting a communicator who is not granted a monopoly of all or part of the city to submit to the massive controls of its "model ordinance," that fact could hardly justify the infringement of First Amendment freedoms inherent in its 90-day moratorium upon CCC's right to speak.[9]

Moreover, a desire to dictate who shall monopolize CATV communications in Boulder cannot serve as the articulated, compelling state or governmental interest required to justify an otherwise constitutionally prohibited silencing of the right of free speech and free press. That is true whether the awful sound of silence lasts for 9 days or 90 or 900.

The city says the moratorium does not regulate program "content," but a stifling of all content is the ultimate in content regulation.

The city says the trial court rejected CCC's "claim that the moratorium violated the First Amendment" as "an obvious overstatement of the law"—but it was an allegation that the First Amendment precluded "any interference" that was so characterized by the trial court. Note 4, *supra*. There may, of course, be limited compelling government interests permitting some interference, as the cases have shown. As above indicated, however, an insistence on maintenance of monopoly is not such an interest.

The city cites *NBC v. United States*, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed.

1344 (1943), wherein the FCC's denial of a broadcasting license was affirmed, forgetting that the FCC is statutorily empowered and required to parcel out scarce airwaves, in the physically limited broadcast spectrum, as the Court so clearly stated. That situation is entirely different from the one before us. Cited also are *Conley Electronics Corp. v. FCC*, 394 F.2d 620 (10th Cir. 1968); *United Sates v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *Great Falls Community Cable Co. v. FCC*, 416 F.2d 238, 240 (9th Cir. 1969); *Black Hills Video Corp. v. FCC*, 399 F.2d 65, 69 (8th Cir. 1968); and *Buckeye Cablevision, Inc. v. FCC*, 387 F.2d 220, 225 (D.C.Cir. 1967), for the proposition that courts have upheld intrusions "greater than that posed here." It is answer enough that all of those cases involved FCC controls over re-transmission of broadcast signals, and none involved the egregious choking off of a licensee's contractually-based right to speak to more people within its licensed area.[10]

Even in respect of the broadcast medium, where scarcity of broadcast channels both requires and justifies regulation, the Supreme Court has jealously guarded the First Amendment, saying, for example, "It is the right of viewers and listeners, not the right of the broadcasters, which is paramount. It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market,

and again:

> I disagree that the evidence shows that cable television is such a natural monopoly that the only feasible competition is in the process of currying favor with the City Council to obtain a permit to operate. To the contrary, the evidence is that there can be competition in the marketplace, with the choice of price and service left to the consumers.

9. The city and Colorado's Attorney General cite the refusal of BCC and 2 other potential cable operators to compete unless they are granted a monopoly over all or part of the city as "evidence" that "economics" preclude open competition. That the operations of multiple competitors may result in one getting more customers than another, however, is an inherent element

of, not an economic barrier, to competition. *United States v. Alcoa*, 148 F.2d 416, 430 (2d Cir. 1945).

10. The city correctly says it cannot be forced to grant a license to "every operator that applies," but that is not to say that the city can unilaterally stifle the voice growth of an operator already licensed, for the sole purpose of enabling the city to choose a favorite monopolist or series of neighboring monopolists. Nor, assuming financial integrity and willingness to comply with police power regulations relating to use of the city's rights of way on the part of applicants, no reason is seen or cited why licenses should not be granted to those applicants.

whether it be by the Government itself or a private licensee." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (citations omitted). Here the city's actions, whether or not well-intentioned, reflected a callous and total disregard of "the right of the viewers and listeners," by preventing the 80–90% of Boulder's citizens outside CCC's operating area from receiving *any* cable communicator's ideas, until the city decides *which* one monopolist's ideas they will be permitted to hear.[11]

When, as studies show, the majority of our people get their news from television, I cannot, in First Amendment jurisprudence, and concerning action to still a growing voice, distinguish the dissemination of news and information by cable TV from that by newspapers.[12] Surely, an attempt by a city to use control of its streets and ways as a bludgeon to deny delivery of a newspaper to new subscribers for 90 days would be rapidly struck down on First Amendment grounds. The more so when it became clear that the denial was but a first step in a plan to insure the presence of only one newspaper, approved by the city and operating under the city's rigid control of its contracts and content.[13]

Even when then-extant technology indicated that CATV might be a natural monopoly, the court said in *Home Box Office, Inc. v. FCC*, 567 F.2d 9 at 46:

In any case, scarcity which is the result solely of economic conditions is apparently insufficient to justify even limited government intrusion into the First Amendment rights of the conventional press, see *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 247–256, 94 S.Ct. 2831, 2834–38, 41 L.Ed.2d 730 (1974), and there is nothing in the record before us to suggest a constitutional distinction between cable television and newspapers on this point.

Further, in *Midwest Video v. FCC*, 571 F.2d 1025, 1053 (8th Cir. 1978) the court said:

Government control of business operations must be most closely scrutinized when it affects communication of information and ideas, and prior restraints in those circumstances are presumptively invalid. See *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).

All the injunction on review prohibited was unilateral restriction by the city of CCC's right to "conduct its cable television business." In my view the quoted phrase is a synonym for CCC's right to "speak." I would affirm the injunction on First Amendment grounds.

### The Contract Approach

It should be remembered that we deal here also with *contractual* rights. All of

---

11. The city's brief repeats, in reference to the First Amendment, that its moratorium was to prevent CCC's monopolization and "to foster competition in" the marketplace. But the city could have done all that with ease by merely granting additional non-exclusive licenses. As established in the record, found by the trial judge, and not denied by the majority, the moratorium, and its continuation, is critical to the city's effort to *prevent* competition and to *insure* monopolization, albeit by the monopolist it considers "best."

12. The record on this interlocutory appeal reflects no intent by city officials beyond a desire to grant monopoly licenses to one or more "best" monopolists. An absolute freedom to stifle unilaterally the growth of a licensed communicator, because city officials disliked its programming or its editorial position in an upcoming election, for example, could certainly

chill the exercise of that communicator's First Amendment rights. Like the power to tax, a unilateral, arbitrary power to stunt can also be the power to destroy.

13. Colorado's constitution speaks of city autonomy in "local and municipal matters." The trial court and the majority here refer to "local concern." CATV is not merely a local matter, *United States v. Southwestern Cable Co.*, 392 U.S. at 168–169, 88 S.Ct. at 2000–01, but if it were, that fact would be irrelevant to First Amendment implications. It is difficult to imagine a more local enterprise than a newspaper composed, edited, printed, and distributed within any of the thousands of communities like Boulder in the United States. Moreover, a Colorado city's authority in relation to non-communication type activities must be carefully circumscribed when it is applied to restrict First Amendment rights.

the involved "ordinances" are, in fact and by their terms, contracts. The trial court found that the city "finessed" an apparent "lack of regulatory authority" by "use of a contract approach," in the 90-day moratorium "ordinance" 4472. CCC and the city are parties to the original license contract. It is not even argued that CCC has failed to pay the city's fee or breached its original contract in any way. All the present injunction does is to require that the city honor its existing contract so long as it is honored by CCC. The injunction could be sustained on that ground alone, without injection of either First Amendment or antitrust considerations.

Though the original contract is terminable at will by the city, the city did not terminate it, the city's attorneys having advised that it could not do so absent breach by CCC. The city does not here argue that its power to terminate justified the 90-day moratorium on CCC's effort to serve more consumers under its contract. Nor, would it seem, can the city be heard to assert a right to unilaterally amend the contract, from one covering the right to serve the 82,000 residents of Boulder to one covering only the right to serve 10–20% of those residents presently offered service by CCC.

Though the parties may acquire, after trial, an answer respecting the city's liability or immunity under the Sherman Act, we are here confronted with the sole question of whether this court should affirm the injunction against unilateral action by the city to prevent CCC from carrying out its lawful business under its original and continuing contract. Common principles of contract law and equity would appear to impel affirmance.

As the trial court said:

In summary, the plaintiff has established the need for a preliminary injunction for the protection of its business from irrevocable injury which could occur pending the final resolution of this dispute, under the standards set forth in *Continental Oil Company v. Frontier Refining Co.,* 338 F.2d 780 (10th Cir. 1964).[14]

### The Sherman Act[15]

Beginning at the beginning, that is, with the Constitution, Article VI, Clause 2, reads in pertinent part:

This Constitution, and the laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding.

It would seem hardly arguable that the federal antitrust law is among "the laws of the United States" and was made "in Pursuance" of the Constitution. Nor would it seem that federal judges appointed under the Constitution are any less "bound thereby" than "the Judges" who preceded them chronologically "in every State." Nor can I believe that the 55 cities of Colorado, or the many thousands of cities in the United States, are any less bound than state and federal judges. Nor can I believe that a city ordinance can do what "the Constitution or Laws of any State" cannot do, namely the creation of new immunities from "the supreme Law of the Land."

In 1942, concentrating on whether Congress intended the Sherman Act to apply to state legislative action, the Supreme Court held in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, that nothing in the

14. That the trial court may have founded its judgment primarily on reasons deemed erroneous by the majority on appeal is not controlling. It is a judgment we review, not reasons.

15. The city has not yet been found guilty of violating the antitrust laws. We deal only with whether a city like Boulder may be enjoined from unilaterally restricting, limiting, or revoking plaintiff's lawful, contractual rights to oper-

ate its business. Though in my view the city's actions did violate the Sherman Act, and will probably be shown at trial to have done so, the majority opinion rests on immunity from suit, the violation being presumed. The brief of the Attorney General of Colorado argues persuasively against immunity, but is mistaken on the facts and therefore unpersuasive in arguing that there was no violation.

Act or its legislative history so indicated. Article VI not having been mentioned, it must be assumed that the Court, 38 years ago, considered the supremacy clause inapplicable in the absence of congressional intent that it be applied, in the particular case of the Sherman Act, to state legislation. Presumably, the alternative being nullification, the clause would require the states to avoid interference with application of the Act to "persons" and "corporations" within their borders. Indeed, unlike the facts here, the Court in *Parker* found no agreement or contract involved, and "no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." *Id.* at 351–52, 63 S.Ct. at 314.

Emphasizing our federalism, the Court in *Parker* said, "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 351, 63 S.Ct. at 313.

Whatever may or may not be said of the relationship, if any, between Article VI and the 1942 holding of the Court in *Parker*, it would appear clear that *Parker* created an *exception*. That exception is limited to *state* legislative action. Indeed, the Court said in *Parker*: "True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful," citing

*Northern Securities Co. v. United States*, 193 U.S. 197, 332, 344–47, 24 S.Ct. 436, 454, 459–61, 48 L.Ed. 679 (1904), 317 U.S. at 351, 63 S.Ct. at 314.

Thirty-two years after *Parker*, the Court decided *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), saying, "anticompetitive activities must be compelled by direction of the State acting as a sovereign," *Id.* at 791, 95 S.Ct. at 2015. In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Court reaffirmed that to be exempt anticompetitive activity must implement a *statewide policy.* *Id.* at 585, 96 S.Ct. at 3115. In *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court said antitrust immunity can exist where a policy requiring anticompetitive conduct is part of a comprehensive regulatory scheme, clearly articulated, affirmatively expressed as state policy, and actively supervised by the state as policymaker. *Id.* at 362, 97 S.Ct. at 2698. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court addressed state action immunity for cities. After noting the strong presumption against implied immunity, *Id.* at 398, 98 S.Ct. at 1129, the Court ruled that municipalities are not automatically immune solely because they are governmental entities, *Id.* at 411, 98 S.Ct. at 1136, and that it must appear "that the legislature contemplated the kind of action complained of." *Id.* at 415, 98 S.Ct. at 1138.[16]

---

**16.** Post *Lafayette* jurisprudence has been in accord. *See e. g., United States v. Texas Board of Public Accountancy*, 464 F.Supp. 400 (W.D. Tex.1978), *aff'd per curiam*, 592 F.2d 919 (5th Cir.), *cert. denied*, 444 U.S. 925, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979) (no immunity, prohibiting accountants from competitive bidding was neither directed by nor within contemplation of state Accountancy Act, authorizing rules for maintaining high standards for accountants); *Mason City Center Associates v. City of Mason City*, 468 F.Supp. 737 (N.D.Iowa 1979) (no immunity, anticompetitive agreement in exercise of city's zoning power was not within direction or contemplation of state statute conferring zoning powers and authorizing zoning mechanisms); *Pinehurst Airlines, Inc. v. Resort Air*

*Services, Inc.*, 476 F.Supp. 543 (M.D.N.C.1979) (no immunity, county board's statutory authority over airport did not authorize its prevention of airline becoming fixed base operator); *Whitworth v. Perkins*, 559 F.2d 378 (5th Cir. 1977), *vacated and remanded sub nom. City of Impact v. Whitworth*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *cert. denied*, 440 U.S. 911, 99 S.Ct. 1224, 59 L.Ed.2d 460 (1979) (no immunity, city zoning ordinance allegedly part of conspiracy in restraint of trade); *Kurek v. Pleasure Driveway & Park District*, 557 F.2d 580 (7th Cir. 1977), *vacated and remanded*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *reinstated on remand*, 583 F.2d 378 (7th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979) (no immunity, park district's

In my view, Colorado home rule cities do not have antitrust immunity under *City of Lafayette* standards. No state policy whatsoever exists in relation to cable TV. The subject is not mentioned in Colorado's Constitution or in any state statute. The Colorado Public Utilities Commission has declined to exercise jurisdiction over cable television. *See In re Investigation and Suspension of First Revised Sheet No. 6 of Colorado PUC No. 5 of Mountain States Telephone & Telegraph Company*, decision No. 70749, 19 (January 25, 1968). With no policy whatever on regulation of cable TV, by cities or otherwise, it can hardly be said that Colorado has a state policy "to displace competition" in cable TV with regulation or monopoly public service. Much less can it be said that Colorado has a comprehensive, clearly articulated, affirmatively expressed, and actively state supervised anticompetitive policy for cable TV.

Hear the majority says that because Colorado has done nothing and because Colorado's constitution gives its cities "home-rule," the 55 cities of Colorado are free of the Sherman Act, that they are within their borders "sovereign," that they are to be treated as states and thus within the exception of *Parker*. The majority also says that *California Retail*, in which a city was controlled by a state, is applicable here, where a city is controlling itself. But the dual government, state sovereignty approach of *Parker* and *California* is inapplicable here. We are a nation not of "city-states" but of States.

Not mentioned by the majority is *City of Denver v. Sweet*, 138 Colo. 41, 329 P.2d 441 (1958), in which the Colorado Supreme Court rebuked home-rule cities which "think of themselves as being like medieval city-states with plenary powers," adding, at 444–445:

statutory authority over golf courses did not exempt price fixing not within direction or authorization of the governing statute.

**17.** The Colorado constitution, as broadly and literally interpreted by the majority, would appear to render Boulder immune from the Sher-

The United States Constitution provides for a national system of *states*. All powers not expressly granted to the federal government are reserved to the *states or to the people*. . . . Clearly our federal system does not envisage as a part thereof city-states. It therefore allows that home rule cities can be only an arm or branch of the state with delegated power. (emphasis in original)

"[A]nything in the Constitution [of Colorado] to the Contrary notwithstanding," I think the Sherman Act must be applied to Boulder, if we would not have the pieces of the pie be larger than the pie.[17]

The majority interprets the Court's denial of immunity in *City of Lafayette* as occasioned by the presence there of proprietary interest and the absence there of direction or authorization by the state pursuant to state policy to displace competition with regulation or monopoly public service. It then dismisses *City of Lafayette* by calling Boulder's contractual activity "an exercise of governmental authority" (a label applicable to any and all action by any government), and by substituting, in reliance on Boulder's "home rule" status, the city's policy, which it describes as "fostering competition to receive a franchise," for the required-but-absent state policy "to displace competition."

In *City of Lafayette*, the city owned and operated its electric utility. The plurality declined, however, the invitation to decide on that basis in the Chief Justice's concurring opinion. As Mr. Justice Marshall's concurring opinion emphasized, and the majority here appears to recognize, the "test established" in *City of Lafayette* is whether a city's action is "directed or authorized by the state 'pursuant to state policy to displace competition with regulation or monopoly public service.' "

man Act, and any other Act of Congress, at least insofar as the matter were viewable as one of "local concern," even if the state's policy was to encourage competition, and if state legislation prescribed adherence to the particular Act of Congress under review.

If the city's direct engagement in entrepreneurial activity had been so influential in *City of Lafayette*, the plurality would not, presumably, have required 22 pages to say so; nor would it have been required to explicate its "state policy to displace competition" rationale, nor would it have included the strong warnings against the implication of immunity.

Whatever guidance may be lurking in the lacuna of the five opinions in *City of Lafayette*, the key to its dismissal by the majority here appears to lie in the view that CATV is solely a matter of local concern. If that be so, the majority's literal interpretation of the Colorado constitution, its treatment of city action as state action, and its holding of absolute immunity from the reach of the Sherman Act, would display a surface logic. But, as the trial judge said, "there are wider concerns." The widest, as above indicated, is concern for First Amendment freedoms. The wider concern for the national policy of free and open competition should stay the hand of the courts in adding an exception for cities to the exception for states arising from *Parker v. Brown*. I would affirm the injunction, if necessary, on the grounds cited as a primary basis by the trial court, that is, that the city's conduct "in reasonable probability will be declared to be unlawful under the antitrust laws."

## The Majority Opinion

The majority opinion is rooted in a perceived absolute immunity of the city from the federal antitrust laws, and, understandably, treats only that question. I remain sorely troubled, however, by what to me is a gnawing presence of negative pregnants.

First, the majority faults the trial judge for not differentiating between the "two principal actions" of the city.[18] But there was no reason to differentiate. The city's actions, like a man's legs, were of equal dimension and importance in the city's scheme. Moreover, as the majority recognizes, the moratorium expired the day after the injunction issued and the trial judge did differentiate, in considering the model ordinance and refusal to deny an intent to repeat the the moratorium as substantial and continuing factors, which, as discussed above, they were and are.

Next, the majority faults the trial judge for objecting to the way things were done, not to what was done. But in its quote from the opinion below, the trial judge is pointing out that what was *done* was *not* "regulation," that what was *done* was *not* an exercise of the police power, and that what was *done* was an employment of the city's contracting function, which it unquestionably was.

The majority says the authority of the city is not an issue, but elsewhere says that whether the authority of the city encompasses an unlimited freedom to violate the Sherman Act is the central issue. The majority then cites the Colorado Supreme Court's *Manor Vail* decision, finding it pregnant with possible relation to this case, though the court nowhere mentions the Sherman Act in that decision.[19]

The majority then visualizes cable TV as purely a local matter, a view in conflict with the directly contrary holding of the Supreme Court in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168–169, 88 S.Ct. 1994, 2000–01, 20 L.Ed.2d 1001 (1968).[20]

**18.** There were actually three actions: (1) Ordinance 4473, the 90-day moratorium and its enforcement; (2) Ordinance 4472, making plaintiff's continued service an acceptance; and (3) creation and offering the proposed model ordinance, giving the city total control-by-contract of the cable TV business in Boulder, as well as the right to eventual ownership of that business. The city was specifically and repeatedly advised by its attorneys that only by use of its contracting power might it escape a charge of antitrust violation.

**19.** The nature of the activity under review is important. Rates applicable to all similarly situated were set by the city in *Manor Vail*. In the present case, some citizens were permitted service by CCC, while others were denied that service, and the city's actions were specifically designed and intended to insure a monopoly.

**20.** The majority's citation of *TV Pix, Inc. v. Taylor*, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746, as involving a situation comparable with this case appears strained. In *TV Pix*, the

Whatever may have been meant by dismissing the "differences between control by contract or by police power" (the differences are substantial and on occasion critical), the city is by its challenged ordinances very much "in the television business." The city's "ordinances" are, in fact and intent, *contracts*, reflecting a *proprietary* interest. In my view, as in that of the trial judge, the challenged actions of the city had nothing to do with public safety, the control of its ways being merely the weapon used to control entry to the cable market. Its actions were not government actions and were not an exercise of "governmental" authority. On the contrary, the city's "proprietary interest," and its desire to acquire a greater proprietary interest, permeated and dictated all of its actions here involved.

The majority then asserts that the city held discussions and hearings, stated its purposes, and employed a consultant, but elsewhere asserts that the issue is not the way things were done but what was done. And what was done was an apparent violation of the federal antitrust laws, as the majority confirms in its statement that "The city adopted a policy of fostering *competition to receive* a franchise, . . . ." (my emphasis) that is, a competition *for* the market, not competition *in* the market. The relevance of the phrase, "again a nonexclusive franchise," like the city's insistence on calling its actions "pro-competitive", is difficult to understand in light of the city's unquestioned freedom at all times to grant additional non-exclusive franchises and its continued refusal to do so. The phrase may also be misunderstood if considered in any way related to the challenged city actions, which were an attempt to "restrict the lawful business" of plaintiff, hav-

ing the "direct and immediate effect" of "a restraint of trade and an artificial and unreasonable geographical market allocation," as the trial judge correctly found.

As discussed above, I most respectfully disagree with the majority's effective adoption of the dissent in *City of Lafayette.* Nor can I find support for the result here in *California Retail,* which would permit immunity only when the restraint is "clearly articulated," "affirmatively expressed" and "actively supervised" by the *state.* The home rule status of Colorado cities, and the negative fact that state articulation, expression, and supervision are totally absent, cannot in my view make *California Retail* pregnant with pertinence here.

Lastly, though I agree that the trial court focused primarily on "the antitrust factor," this court should, as above indicated, take a broader view of the case.[21]

Treating the city's argument that it had the power of a state over local concerns, the trial court said:

> Obviously there are wider concerns, including interstate commerce, giving rise to some uncertainty about the power of the state government in this regard, both in terms of an obstruction to interstate commerce, and with respect to the First Amendment rights of communicators.

Recognizing that the city's total-control ordinance had not yet found a cable TV enterprise to accept it, but also recognizing the critical relationship of the moratorium and the model contract, the trial court cautioned:

> The City should carefully consider the need to exercise its authority by narrowly drawn regulations which do not unnecessarily interfere with First Amendments

---

Supreme Court, by order and without comment, affirmed a judgment in which the district court, 304 F.Supp. 459 (D.C.Nev.), stated that cable TV *was* in interstate commerce but that its limited equipment regulation as a utility by the State did not unconstitutionally interfere with that commerce. That regulation was vastly different from the market control-by-contract attempted by the city here. Again, the federal antitrust law is nowhere mentioned in *TV Pix.*

**21.** The majority recognizes that the first moratorium terminated long ago, yet appears to focus solely on that action. Though I view that action alone as impermissible on First Amendment grounds (and note its intended and inevitable repetition by the city following issuance of the majority opinion), I submit that it cannot be viewed in a vacuum.

freedoms, as the Supreme Court has cautioned in *Village of Schaumburg v. Citizens for a Better Environment*, 441 U.S. 922, 99 S.Ct. 2029, 60 L.Ed.2d 395 (1979).

Attempting to follow this court's concern for equity in such circumstances, the trial court found CCC injury irreparable and balanced the equities, saying:

> If this lawsuit is finally decided in favor of the defendant City of Boulder, any injury which it may sustain can be remedied by removal of the cables involved in the extension of the plaintiff's plant.
>
> . . .

In balancing the equities, the trial court did indicate that the city's "conduct" was such that it "in reasonable probability will be declared unlawful under the antitrust laws," but took a broader look:

> What equity requires here is that the plaintiff be protected in the exercise of the lawful rights which it had prior to the conduct which in reasonable probability will be declared to be unlawful under the antitrust laws. In considering the public interest and how it may be affected by this injunction, it is necessary to look beyond Boulder to the national policy of protecting free market competition.

In reversing the judgment below (i. e., in vacating the injunction order) the majority effectively holds that the city is at liberty to unilaterally prevent the exercise of plaintiff's lawful contract rights, and cannot be stopped from doing so to the irreparable harm of plaintiff, regardless of equity, even pending completion of trial. Moreover, as I view the outcome here, the city can do so without citing a single valid basis or reason.

Convinced that the city has shown no basis for its infringement of CCC's and Boulder's citizens' freedom of press and speech, of CCC's contract rights, and of CCC's right to compete freely and fairly in the marketplace, I must, with reluctance and with full recognition of personal capacity for error, respectfully decline to join the majority opinion.

*Conclusion*

The city of Boulder's interference with the lawful business of plaintiff, as part of a plan to manipulate and control the market for cable TV services in Boulder, with inherent and concomitant infringement of CCC's and cable consumers' First Amendment rights, fully justified the injunction. I would set aside Sherman Act considerations on this appeal and affirm the injunction order on First Amendment grounds.